Filed 11/6/13  Hudack v. Siggard CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MARIANNE S. HUDACK et al., | |
| Plaintiffs, Cross-defendants and Appellants, | E052779 |
| v. | (Super.Ct.No. RIC450529) |
| WAYNE SIGGARD, | |
| Defendant, Cross-complainant and Respondent; | |
| MONTELEONE CONTRACTORS, INC. et al., | |
| Defendants and Respondents. | |
| MARIANNE S. HUDACK et al., | |
| Plaintiffs and Appellants, | E053129 |
| v. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| WAYNE SIGGARD et al., | |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

1

The petition for rehearing is denied. The opinion filed in this matter on October 17, 2013, is modified as follows:

In the first paragraph on page 11 of the opinion, the second complete sentence reads: "On approximately March 25, Siggard submitted his grading permit and maps of his grading plans to the Association."

The sentence is modified to read as follows:

"On approximately March 25, Siggard submitted his agricultural exemption and maps of his grading plans to the Association."

Except for this modification, the opinion remains unchanged. The modification does not affect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RICHLI
Acting P. J.

CODRINGTON
J.

2

Filed 10/17/13 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MARIANNE S. HUDACK et al., | |
| Plaintiffs, Cross-defendants and Appellants, | E052779 |
| v. | (Super.Ct.No. RIC450529) |
| WAYNE SIGGARD, | |
| Defendant, Cross-complainant and Respondent; | |
| MONTELEONE CONTRACTORS, INC. et al., | |
| Defendants and Respondents. | |
| MARIANNE S. HUDACK et al., | |
| Plaintiffs and Appellants, | E053129 |
| v. | |
| WAYNE SIGGARD et al., | OPINION |
| Defendants and Respondents. | |

1

APPEAL from the Superior Court of Riverside County. Dallas Holmes (retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), Thomas H. Cahraman and Bernard Schwartz, Judges. Affirmed.

Buchalter Nemer, Robert M. Dato; Circuit, McKellogg, Kinney & Ross and Robert Keith McKellogg for Plaintiffs, Cross-defendants and Appellants Marianne S. Hudack, Larry J. Hudack and Larry J. and Marianne S. Hudack Trust UTD July 3, 1997.

The Rossell Law Firm, Craig N. Rossell; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Defendant, Cross-complainant and Respondent Wayne Siggard.

The Rossell Law Firm and Craig N. Rossell for Defendants and Respondents Monteleone Contractors, Inc. and Ryan Monteleone.

Pamela J. Walls, County Counsel and Lisa A. Traczyk, Deputy County Counsel for Defendant and Respondent County of Riverside.

Kramer, Deboer, Endelicato & Keane, Jeffrey S. Kramer, Sandra Calin and Elizabeth D. Beckman for Defendant and Respondent La Cresta Property Owners Association.

## I.

## __INTRODUCTION__

This case arises from a dispute between neighbors. Wayne Siggard (Siggard) caused land he owned to be graded. Siggard's neighbors, Marianne Hudack (Marianne) and Larry Hudack (Larry)[1] (collectively "the Hudacks"), found the grading to be

---

[1] We use first names for clarity and ease of reference; no disrespect is intended.

problematic.  In a fifth amended complaint, the Hudacks sued (1) Siggard; (2) Monteleone Contractors, Inc. (Contractor); (3) Ryan Monteleone, an individual doing business as Monteleone Excavating (Monteleone); (4) La Cresta Property Owners Association (the Association); (5) Sergio Ochoa; and (6) Laura Ochoa.  The causes of action concerned (1) a violation of the California Environmental Quality Act (CEQA); (2) trespass; (3) encroachment; (4) nuisance per se; (5) private nuisance; (6) negligence; (7) breach of fiduciary duty; (8) negligent misrepresentation; (9) fraud and deceit; (10) a request for declaratory relief; (11) a request for injunctive relief; and (12) a request for cancellation of written instruments.

Siggard filed a cross-complaint against (1) Marianne; (2) Larry; (3) the Larry J. and Marianne S. Hudack Trust (the Trust); (4) the County of Riverside (the County); and (5) the County of Riverside Planning Department.  The cross-complaint included causes of action for (1) a CEQA violation; (2) trespass; (3) encroachment; (4) nuisance; (5) civil conspiracy to defraud; (6) defamation, slander, and libel; (7) interference with a prospective economic advantage; (8) slander of title; and (9) intentional infliction of emotional distress.

In response to the cross-complaint, the Hudacks filed an anti-SLAPP motion.  (Code Civ. Proc., § 425.16.)  Some of Siggard's causes of actions were stricken as a result of the trial court's anti-SLAPP ruling.  Ultimately, a jury found against the Hudacks on their causes of action.  The jury found in favor of Siggard on his private nuisance claim against the Hudacks.  The jury awarded Siggard $437,200 in economic damages and $167,500 in punitive damages.

3

The Hudacks raise eight issues on appeal.  The Hudacks' first issue concerns Siggard's lawsuit against the Hudacks.  The Hudacks contend substantial evidence does not support the jury's private nuisance verdict in favor of Siggard.  The second and third contentions concern the Hudacks' lawsuit against Siggard and Contractor.  The second contention is the judgment on the Hudacks' private nuisance claims against Siggard and Contractor should be reversed because the jury was improperly permitted to consider whether Siggard's grading violated a County ordinance.  The third contention is the trial court erred by denying the Hudacks' motion for new trial because there was "a fatal inconsistency" between the jury instructions and special verdict form concerning private nuisance.  The fourth issue on appeal concerns a trial court writ of mandate the Hudacks sought against the County.  The Hudacks assert the trial court erred by concluding the County had complied with the writ.

The Hudacks' fifth through eighth causes of action concern their lawsuit against the Association.  The Hudacks' fifth contention is the trial court erred by granting the Association's demurrer on the breach of contract cause of action.  The sixth contention is the trial court erred by granting the Association's demurrer on the breach of fiduciary duty cause of action.  The seventh contention is the trial court prejudicially misinterpreted the trial court's prior summary adjudication ruling.  The eighth contention is the jury instruction concerning the Association's duties to property owners was misleading.  We affirm the judgments.

## THE HUDACKS, SIGGARD, CONTRACTOR AND THE COUNTY

In this section of the opinion, we address the issues pertaining to the Hudacks, Siggard, Contractor, and the County.

## FACTUAL AND PROCEDURAL HISTORY

### A.    Siggard and Hudack Property Purchases

Rancho La Cresta (La Cresta) is a residential community located in an unincorporated area of Riverside County near Murrieta and Temecula.  La Cresta has a minimum parcel size of five acres, and consists of 59 parcels.  In 2000, La Cresta consisted of a large amount of open space with trees, valleys, and seasonal streams; approximately 60 percent of the home sites in the community were vacant, i.e., they had not been built upon.

Siggard builds luxury custom homes.  Siggard is licensed as an attorney, contractor, and real estate broker.  In April 2000, Siggard purchased a 10-acre parcel in the La Cresta community.  Siggard's parcel was crossed by a stream known as Bear Creek.  Siggard's parcel was undeveloped at the time he purchased it, with the exception of two residential pads on the property and utilities at the street.  The residential pads on the property were not certified by the County to be built upon.  In order to build on the pads, a person would need to have obtained a grading permit from the County, performed grading work, and then have the work approved by the County.

Larry worked as an engineer, an investment banker involved in the area of real estate partnerships, and a real estate appraiser.  In 2000, the Hudacks were looking for a

retirement home and discovered the La Cresta community. The Hudacks appreciated the open space provided by La Cresta; Larry planned to grow produce, such as avocados, on his property. In August 2000, the Trust purchased two adjoining parcels in La Cresta. The Hudacks' property was next to Siggard's property. The Hudacks received the La Cresta restrictions, covenants, and bylaws when the property was purchased.

One of the Association's bylaws provided: "No building, garage, patio, outbuilding, fence or other structure shall be constructed, erected, altered, remodeled, placed, maintained or be permitted to remain on said Tract, or any portion thereof, unless and until three complete sets of plans and specifications therefor, including finished grading plans, plot plan showing location of such structure on the building site, floor and roof plan, exterior elevations, sections and salient exterior details and color scheme, including the type and location of hedges, walls and fences, shall have been submitted to and approved in writing by any two (2) members of the 'Architectural Committee' which shall be composed of not more than three (3) members."

B.    SIGGARD'S 2001 GRADING WORK

Siggard's property was crossed by dirt roads that were "fairly steep" and had become rutted from erosion. In June 2001, Siggard listed his parcel for sale at a price of $359,000. Also in 2001, Siggard used a skip loader to scrape the roads flat—removing the ruts caused by water on the roads. Siggard also scraped the two pads to prevent weeds from growing on them. Siggard did not seek approval from the Association or a permit from the County to grade his property because he believed approval and a permit

6

were only required for building a structure—approval was not needed for simply "moving dirt." Larry and two other homeowners filed complaints against Siggard with the Association. Larry complained Siggard was grading without a permit, building residential pads, creating roads, and affecting a stream. Complaints were also filed with the County.

In July 2001, Siggard received a "notice of non-compliance" from the County for performing grading work without the necessary permits. As a result, Siggard attended a series of administrative hearings. Siggard negotiated with the County to remove an "Arizona crossing" from Bear Creek that was on the property when Siggard purchased it. An "Arizona crossing" is several pipes with dirt over the pipes. There were no permits for the Arizona crossing. As part of that negotiation, the County released the "notice of non-compliance," effectively dismissing the citation.

In August 2001, the Association sent Siggard a letter reflecting that it concluded he had not committed any violations because he was "not grading in preparation to build a structure." In that letter, the Association cautioned Siggard that he could potentially violate the covenants, conditions, and restrictions (CC&Rs) concerning drainage if he performed erosion control work. Larry also filed a complaint with the Department of Fish and Game concerning Siggard's grading work. Siggard received a citation from the Department of Fish and Game. Siggard could not recall if he received any offers to purchase the property in 2001.

C.      <u>SIGGARD'S ATTEMPTS TO SELL HIS PROPERTY IN 2002 AND 2003</u>

In late 2002, Siggard prepared plans and a grading application for his property. Siggard submitted his plans to the County. In January 2003, the County responded with a document entitled, "Plan Check Corrections from the Building and Safety Department," which reflected issues the County thought Siggard should be prepared to address during the project such as (1) excessive grading, (2) grading and drainage crossing Bear Creek, and (3) obtaining clearance from the Army Corps of Engineers and Department of Fish and Wildlife for work being done near Bear Creek. To address the building department's concerns, Siggard obtained a "biochemical consulting report," but then decided to pursue selling the property rather than obtaining the grading permit. Thus, the permit process went "dormant," and the County refunded Siggard's application fees. Siggard did not choose to sell the property because of issues with the County, he decided to sell because he needed the money at that time.

In March 2003, Siggard submitted plans to the Association to grade the property and construct a front wall, gate, and bridge. The Association approved the bridge and grading portions of the application, but denied the wall and gate plans. Siggard obtained the approvals in order to help sell the lot. Siggard thought the property would be more attractive if it came with some construction approvals.

Also in March 2003, Siggard approached Larry to determine if Larry was interested in purchasing Siggard's property. Siggard asked Larry for $325,000. According to Siggard, Larry immediately agreed to purchase the property. According to

Hudack, he asked for permission to "walk the property and look it over." Siggard gave Larry the engineering plans, "bio consulting plan," the building and safety department's "Plan Check Corrections," a purchase agreement, and escrow instructions.

In April 2003, Larry sent Siggard a letter with various questions and concerns about Siggard's property. For example, Larry wanted the property lines of the lot to be clearly identified. Larry closed the letter by writing, "Accordingly, I request that we agree that the price of the land to be purchased shall be $200,000 and that the value of the plans and permit shall be assigned a value of $125,000."

Siggard tried to respond to Larry's questions and concerns. For example, Siggard hired a surveyor to check the property lines. After Siggard failed to hear from Larry for a month, Siggard called Larry and asked, "'Well, are you going to buy this or are you not?'" Larry responded to Siggard via letter. In the letter, Larry questioned Siggard's representation that a two and one-half acre primary home site could be developed on the property, because it appeared the County would limit grading to "'no more than 15 percent'" of the property. Larry wrote that the property was not worth the $325,000 purchase that had been discussed. Larry offered Siggard $265,000. Siggard was not interested in selling the land at that price; Siggard had a $250,000 mortgage on the property. The negotiations between Larry and Siggard ended at that point. Siggard turned his focus to building homes in other areas and trying to sell other properties he owned.

D.     SIGGARD'S GRADING WORK IN 2006

In 2006, the County was preparing to vote on an ordinance that Larry had mentioned in his 2003 letter. If the ordinance were approved, Siggard would have been limited to grading only 15 percent of his property. In 2006, when the County scheduled the vote on the "15 percent ordinance," Siggard decided that if he were going to put roads on the property "it was going to be then or never." Siggard needed to alter the roads on the property because some of them were so steep that "a regular car couldn't get up" them. Siggard also planned to plant trees on the property, in order to enhance the property's value. Siggard did not have the financial ability to build a residence on the property, so he did not prepare any plans for constructing a residence.

In late January 2006, Siggard applied County's Agricultural Commissioner for an agricultural exemption to the grading permit process. Siggard believed the agricultural grading permit would allow him to grade his property in support of agricultural activities, such as planting trees, and to create roads and driveways for access purposes. On the application, Siggard wrote that he planned to move approximately 8,000 cubic yards of dirt, remove brush, and possibly move the driveway. Siggard told the agricultural commissioner's assistant that he planned to plant avocado and citrus trees. Siggard indicated that he planned to perform grading work on eight of the 10.2 acres. No engineering plans were submitted as part of the agricultural grading permit process; however, Siggard submitted an aerial photograph of the property indicating where the grading would take place. Siggard's agricultural grading permit was approved on March 23, 2006. The permit required Siggard to

implement erosion controls as part of the grading project. Siggard's erosion control plan was also approved. On approximately March 25, Siggard submitted his grading permit and maps of his grading plans to the Association. The Association granted an extension of the approval for Siggard's 2003 grading application.

Siggard ordered 200 avocado trees to be delivered by the end of summer 2006. Contractor was hired to perform the grading work. On April 25, 2006, Contractor began grading Siggard's property. Siggard told Contractor to make the roads "accessible," ideally under a 15 percent hill grade. Contractor used a bulldozer to perform the grading work.

On approximately May 1, 2006, Larry saw "a really steep cut along [his] property line." Larry instructed Marianne to contact the chairperson of the Association's Architectural Committee to determine if Siggard had permits and permission to be performing grading work. Larry went to Siggard's property where he saw "[a] heck of a lot of grading, moving an extremely large amount of dirt." Larry saw "really steep cuts." The cuts left an oak tree sitting on a "pedestal," as all the other earth had been pushed away from the tree. Larry saw a road was being graded that was partially on the Hudacks' property. The chairperson of the Architectural Committee assured the Hudacks that Siggard had permits and the committee's approval to perform the grading work. For the next two weeks, the Hudacks watched the grading work take place.

On approximately May 15, 2006, Siggard's grading work resulted in a dam being built across Bear Creek. The dam was created when machinery was moved across the

11

creek. As the machinery moved across the creek, the water became muddy. Siggard installed a silt fence, but it was not effective. Thus, Siggard installed an Arizona crossing. Siggard placed a 24-inch pipe in the creek and covered it with dirt, so the machinery could move over the creek without pushing dirt into the water.

On May 17 the water in Bear Creek stopped flowing. At that point, the Hudacks questioned the information given to them by the chairperson of the Architectural Committee. Larry contacted County's Code Enforcement Unit to determine if Siggard had grading permits. Larry discovered no grading permits had been issued to Siggard. Larry contacted the president of the Association's Board of Directors (the Board) and asked him to look at Siggard's property because Larry believed Siggard was violating the bylaws by damming Bear Creek.

On May 17, the Board's president looked at Siggard's property from the property line Siggard shared with the Hudacks. Larry complained that (1) the grading was moving rocks and dirt on to the Hudacks' property, (2) Bear Creek had been disturbed, and (3) a spring that fed oak trees on the Hudacks' property had been rerouted. It appeared to the president that "there was debris" on the Hudacks' property and there had been "some disruption" to Bear Creek. The president could not ascertain if the spring had been rerouted. The president said "he would see to it that a cease and desist [letter] would be issued" to Siggard.

The Association's attorneys sent a letter to Siggard on May 18. The letter asked Siggard to cease and desist from grading his property because Siggard did not have a grading permit. The letter warned that the Association could file legal action, such as

12

an injunction, against Siggard if he did not stop grading his property. In response to the letter, Siggard called the Board's president, but he would not take Siggard's call. Thus, Siggard sent a letter to the Association's attorney. Siggard wrote that the Association's facts were incorrect, but even if they were correct, the Association failed to state facts sufficient to support a cause of action. In a telephone conversation with the Association's attorney, Siggard referred the attorney to the agricultural grading permit he filed with the Association's management office. The Association did not file for an injunction.

On May 19, Siggard received a letter from the Hudacks' attorney. The letter referenced the Association's CC&Rs, but did not cite a specific section for the proposition that Siggard had to cease and desist from his grading work. The letter also reflected that the grading work could be a violation of environmental laws because it impacted a stream and possible protected species habitat. Siggard continued to grade his property. Siggard contacted the Hudacks' attorney, who had sent the letter. The Hudacks' attorney informed Siggard that he had been fired by the Hudacks and they were planning to sue Siggard. The Hudacks' attorney would not give Siggard the new attorney's contact information.

On May 20, 2006, Larry wrote a letter to the Board's president. In the letter, Larry accused Siggard of grading "directly into Bear Creek." Larry theorized that Siggard was using "an agricultural exemption as a ruse or cover story to accomplish land clearing and massive earth movement that would enable him to more favorably present and sell his 10 acre parcel." Larry noted that "Siggard had an Agricultural

13

Exemption and [the County could] not shut him down," but Larry also concluded "Siggard had No PERMITS."

In the letter, Larry faulted the Association for approving Siggard's grading plans without evidence Siggard had "appropriate county permits." Larry asserted Siggard's "grading caused a material and substantial loss of property value for [the Hudacks'] adjoining parcels." Larry believed (1) the oak trees on his property would die due to a lack of water from the spring; (2) mud would move onto his property when it rained from the soft dirt piled "within inches" of the Hudacks' property; and (3) the Hudacks' property would flood when it rained due to the damming of Bear Creek. Larry wrote the Association "must consider that [it] will either be a co-defendant or a plaintiff in this case . . . there is no middle ground."

The Board concluded they would be named in the lawsuit "one way or another," so decided not to take any particular action since the dispute concerned two property owners within the Association. When the Board informed Larry that it would not be joining him as a plaintiff against Siggard, Larry replied, "The gloves are off. We'll see you in court."

On May 22, 2006, the director of County's Building and Safety Unit sent an e-mail to Larry informing him that his claims against Siggard would be investigated, but that the investigation would require "some time to process due to very specific notification requirements." Larry went on to contact the agricultural commissioner, the code enforcement unit, a County Supervisor, the California Environmental Protection Agency, and the California Department of Fish and Game.

Larry also contacted the Contractors State License Board. Larry accused Contractor of grading without a permit and asked the licensing board to inquire into the status of Contractor's contracting license. Larry told the licensing board that Contractor was "a rogue contractor." Larry also took over 1,000 photographs of Siggard's property. Larry wrote in a declaration, "I took hundreds of pictures; in some cases on a daily basis."

E.      COMPLAINT AND CROSS-COMPLAINT

The Hudacks filed their original complaint, initiating the instant case, on May 25, 2006. The Hudacks sued (1) Siggard; (2) Contractor; (3) the County; and (4) the Riverside County Planning Department. The causes of action included (1) breach of contract, (2) trespass, (3) encroachment, (4) nuisance per se, (5) private nuisance, (6) negligence, and (7) a CEQA violation. The CEQA cause of action included allegations that all four defendants, "should have required an Environmental Impact Report (EIR)" for the grading work done on Siggard's property. The Hudacks requested a "[w]rit of mandamus to require the defendants to recognize that the defendants [sic] grading project is subject to CEQA and to require said defendants to comply with the CEQA act [sic] and prepare an [EIR]." The trial court scheduled the hearing on the petition for a writ of mandate for April 2007.

After receiving the Hudacks' complaint, Siggard moved the boulders that had been placed near the property line Siggard shared with the Hudacks. Siggard moved the boulders approximately 40 feet away from the property line, onto his property. Siggard moved the boulders because he was hoping to "just get [the lawsuit] over with."

15

Additionally, on June 1, 2006, Siggard hired a civil engineer to create a grading plan and a storm water pollution prevention plan. Siggard hired the civil engineer to create the plans because he wanted to "get [the lawsuit] done." Siggard thought to himself, "Look, if I do all of these things, will [Larry] just leave me alone and let me proceed with this?"

On June 15, 2006, the director of County's Building and Safety Department sent an e-mail to County Supervisor Bob Buster's legislative assistant. In the e-mail, the director explained, "We sent a grading inspector out to take a look and it was determined that [] Siggard is grading within the scope of his Ag. Registration. We did however, issue him a[ notice of violation] for not having his erosion control in place. As you can tell from the e-mails, [Larry] is not happy with my response and wants the project shut down. Unfortunately [] Siggard has not done anything yet that would allow us to do that. I'll send a grading inspector out again and have them take another look."

In July 2006, Siggard and Contractor filed cross-complaints. In Siggard's cross-complaint he sued (1) Marianne, (2) Larry, (3) the Trust, (4) the County, and (5) County's Planning Department. Siggard included causes of action for (1) a violation of CEQA; (2) trespass; (3) encroachment; (4) nuisance; (5) civil conspiracy to defraud; (6) defamation, slander, and libel; (7) interference with a prospective economic advantage; (8) slander of title; and (9) intentional infliction of emotional distress.

F.    INTERNET COMMUNICATIONS

On July 30, 2006, Larry sent an e-mail to approximately 55 people with the subject line, "Is this the way you really want things run?" Some of the people who

16

received the e-mail were members of the Association; however, some were not members. In the e-mail, Larry complained that the Board was being "used as a tool of disgruntled violators whose sole aim is to disrupt and corrupt our community," because Larry believed the Board was "acting as Siggard's agent." In the e-mail Larry wrote that if it were necessary he would "make [i]t [his] life's work to file a complaint against each and every fence, entry gate, culvert, or otherwise that [he] can identify [as being] in 'violation' anywhere in La Cresta." Larry then recommended people "read the Chicken Little Story," by clicking on a hyperlink Larry provided in the e-mail.

The Chicken Little Story appeared on Larry's website, LCPOALaw.com. At trial, Larry described the story as "a cartoon of mythical characters that was intended to bring a lighthearted or humorous look at the situations going on in La Cresta." Larry testified the characters in the story were fictional. The story was set in "a little kingdom on a hill," where "a lot of chickens" lived. The chickens elected a board of directors, and there were committees associated with the board. The story described one committee as having "the job of making sure all the chickens built their hen houses just right." The committee was described as "want[ing] to say yes to everybody, no matter how outrageous their plans or proposal might be." The story went on for 12 pages. At trial, Larry denied the story was based on real people.

The Board president replied to Larry's e-mail, including all the people that received Larry's original e-mail. The president explained the Association's complaint process to Larry, assured Larry that "the rules are the same for everyone," and stated no

response could be given about the situation involving Siggard because litigation was taking place.

Larry responded, again e-mailing a lengthy list of people, with a list of questions and accusations against the Board. For example, an excerpt of the e-mail reads: "For you[r] information, Siggard has disclosed that you and Kannen did cut a secret deal and agreed to let him continue grading after sending the Cease and Desist letter. Unless he is lying, you really did pull a fast one with your secret deal. Why would you do that? What did you hope to gain? [¶] Why??? [¶] PS Thanks for confirming you have cut off all communications in confirmation of my claims. [¶] PSS Thanks for the heads up. I'll have a much better mailing list for my next communication."

The Board president replied to Larry's e-mail with answers to Larry's questions. For example, the president responded, "The[re] is no 'secret'[]deal[,] never has been one and won't be one. We would NEVER cut a secret deal." Larry responded, still including approximately 50 people. In the response, Larry asserted the president did not answer his questions and concluded, "We have accomplished nothing here. We'll address the appropriate questions in court."

G.      ANTI-SLAPP MOTION

The Hudacks responded to Siggard's cross-complaint with an anti-SLAPP motion. In November 2006, Judge Cahraman ruled on the anti-SLAPP motion. The trial court granted the anti-SLAPP motion as it pertained to Siggard's causes of action for (1) defamation, slander, and libel; (2) interference with a prospective economic advantage; (3) slander of title; and (4) intentional infliction of emotional distress. The

trial court found Siggard was suing the Hudacks "for allegations set forth in [the Hudacks'] legal pleadings." The trial court also found "there is nothing submitted that would demonstrate a probability of prevailing on these causes of action." The trial court also granted the Hudacks' demurrer to Siggard's cause of action for civil conspiracy to defraud, but granted Siggard leave to amend.

On November 21, 2006, the Hudacks filed a second amended complaint. The defendants were (1) Siggard; (2) Contractor; (3) County; (4) County's Planning Department; and (5) the Association. The causes of action included: (1) a violation of CEQA; (2) trespass; (3) encroachment; (4) nuisance per se; (5) private nuisance; (6) negligence; (7) breach of fiduciary duty; (8) breach of contract by failing to enforce CC&Rs; and (9) negligence.

### H. WRIT OF MANDATE AND CEQA RULINGS

The hearing on the petition for a writ of mandate took place on April 4, 2007. After taking the matter under submission, Judge Cahraman granted the writ on May 22, 2007. The writ directed County to "vacate and set aside its approval of the agricultural exemption to the permit requirements; and (2) take such action as may be necessary to bring the project into compliance with [CEQA], sections 21000, et seq., of the Public Resources Code."

On June 18, 2007, the Hudacks filed a motion requesting a hearing on the additional remedies requested in their second amended complaint concerning the alleged CEQA violation. In addition to the writ, the Hudacks requested Siggard (1) be required to restore his property to the condition it was in prior to his grading activity;

19

and (2) "be prohibited from seeking any discretionary land use approval for the Property for a period of five (5) years."

On September 5, 2007, County filed its initial return to the writ of mandate. The return reflected (1) County invalidated Siggard's agricultural grading exemption; and (2) an additional return to the writ would be filed if Siggard applied for another grading permit or agricultural exemption and County's Building Department approved the permit or exemption. Judge Cahraman held a hearing on the Hudacks "additional remedies" motion on September 19, 2007, and took the matter under submission.

On November 15, 2007, the trial court denied, without prejudice, the Hudacks' request to preclude Siggard from obtaining land use approvals. The trial court scheduled a hearing on the request to direct Siggard to restore his property to its pregraded condition. The trial court also scheduled a hearing for an order to show cause "why the court should not refer [the] matter to a referee." The court held a hearing on the restoration and referee issues on January 22, 2008, and took the matters under submission.

On February 7, 2008, the trial court appointed a referee. The trial court ordered the following factual question be resolved: "What remedial action, if any, should [] Siggard be required to perform with regard to the changes he made to his land? The analysis should be based on the environmental damage done and its effect on the Hudacks, if any." The trial court ordered Siggard and the Hudacks equally share the cost of the referee. Judge Cahraman reassigned the case to the civil master calendar department.

## I.     SALE OF SIGGARD'S PROPERTY

On July 1, 2008, Siggard lost his La Cresta property to foreclosure. Washington Mutual Bank acquired Siggard's property. On August 4, 2008, the Hudacks' attorney, R. Keith McKellogg (McKellogg), sent a letter to the realtor handling the sale of Siggard's former property. McKellogg wrote that he understood the listing price for Siggard's former property would be $400,000. McKellogg offered for the Hudacks to purchase the property for $50,000. McKellogg asserted the $400,000 listing price failed to take into account the $250,000 to $300,000 cost of restoring the property to its pregraded condition.

Siggard's former property was purchased by Sergio and Laura Ochoa (collectively "the Ochoas") in January 2009. The Ochoas planned to build a retirement home on the property. After purchasing the property the Ochoas applied to the Association for permission to construct a fence across the front of the property. The Ochoas also wanted to remove a tree or bush that was located along the border with the Hudacks' property. The Association approved the fence but recommended the Ochoas introduce themselves to the Hudacks and ask the Hudacks if it would be okay to remove the tree or bush.

Sergio Ochoa (Sergio) called Larry. Sergio told Larry about his plans to build a fence and remove a bush. Larry asked if the Ochoas had already closed escrow. Sergio responded, "Yes," and asked, "Why?" Larry said the property was involved in litigation, which Sergio had not known about. Larry told Sergio, "[Y]ou're going to be in a bunch of trouble," due to the litigation. Sergio and Larry agreed to meet in person.

21

At the meeting, on February 14, Larry told Sergio the details of the lawsuit.  Larry told

Sergio that he would "give [him] some time to get out of the sale of the property," but

that if Sergio remained the owner of the property then the Hudacks would name the

Ochoas as defendants in their lawsuit.  Larry also offered to purchase the property from

the Ochoas but for "much" less than the Ochoas paid for it.  Eventually, the Hudacks

named the Ochoas in their lawsuit.

J. REFEREE'S REPORT AND SIGGARD'S DEMURRER

The referee held an evidentiary hearing on April 30, 2009.   In a proposed report,

the referee found (1) Bear Creek is a blue line stream[2] "within the jurisdictional

authority of the Department of Fish & Game and is considered a sensitive habitat";

(2) there was a natural spring that fed the oak trees on the Hudacks' property, and that

spring was dammed by the 2006 grading on Siggard's property; (3) Siggard exceeded

his agricultural grading exemption by (a) grading for roads, and (b) excavating

approximately 33,520 cubic yards of dirt; (4) Siggard's property experienced substantial

erosion when it rains, which caused sediment to fall into Bear Creek; and (5) the

grading was done without proper soil compaction.  The referee concluded the banks of

Bear Creek and the creek itself needed to be restored.

The referee recommended the trial court (1) find Siggard and his successors in

interest "jointly and severally liable for all costs related to remediation of the subject

---

[2]  A "blue line stream" is a stream that appears as a blue line on the U.S. Geological Survey Maps.  (Riverside County Flood Control and Water Conservation District, Glossary of Flood Control Terms <http://rcflood.org/RCFCInternetText/Glossary.html> (as of September 27, 2013).

property"; (2) designate a project engineer to supervise the remediation of the property; and (3) order the remediation be completed by October 15, 2009.

In September 2009, Siggard demurred to the Hudacks fifth amended complaint.[3] In the demurrer, it was argued that CEQA "does not specifically authorize an injunction in order for a property owner to return [a] property to a pre-graded state." In other words, the remedy the Hudacks were seeking did not comport with the CEQA [cause of] action. Siggard asserted the appropriate action under CEQA was for County to conduct an environmental review.

Judge Schwartz ruled on the demurrer. The trial court concluded CEQA did not grant the court authority to issue an injunction ordering Siggard to return the property to its pregraded condition. The trial court reviewed the referee's report and noted that restoration of the property was never found to be required by CEQA in that an environmental impact report was never prepared. The court concluded it had the authority to stop the grading, but ordering restoration would be problematic because it would be a second project occurring on the property without an environmental impact report. The court held the proper remedy would be "to remand the project back to the lead agency to conduct the appropriate review." The trial court sustained the demurrer to the Hudacks' CEQA cause of action without leave to amend. The trial court also vacated the scheduled hearing to consider the referee's findings.

---

[3] See our Introduction, *ante*.

K.    THE HUDACKS BECOME OWNERS OF SIGGARD'S FORMER

PROPERTY

The Ochoas filed a cross-complaint against the bank to rescind the sale of the property. The Ochoas' lawsuit "didn't get that far"—they "didn't succeed in litigation." The Ochoas sold Siggard's former property to the Hudacks. The Hudacks paid the same purchase price as the Ochoas plus $20,000 for legal fees, but the Ochoas still lost money on the transactions due to the payments of closing costs, attorneys' fees, and taxes.

On January 11, 2010, the Hudacks graded Siggard's former property without a permit, claiming reliance on an agricultural exemption and an emergency notification filed with the Department of Fish and Game. Larry asserted he was grading in order to mitigate the damage caused by Siggard's grading, while also preparing the land for farming. The Hudacks' grading was performed by an unlicensed contractor.

The Association contacted County's Code Enforcement Unit in regard to the Hudacks' grading activity. Code Enforcement Officer Farlow inspected the former Siggard property on January 12, 2010. Farlow saw "three small loaders working in and around . . . a riparian feature." Farlow spoke to Larry. Larry told Farlow that he was trespassing. Larry also told Farlow he was grading under an agricultural exemption. Farlow told Larry that the creek likely fell within the jurisdiction of the Department of Fish and Game. Larry responded, "'Fish and Game can deal with my lawyer.'" After that comment, Farlow left. Farlow discovered Larry never applied for an agricultural

grading exemption; however, he might not have needed to apply since he was expanding his farming activity from a parcel he owned onto Siggard's former property.

On March 5, 2010, the Association's management company sent the Hudacks a cease and desist letter, directing them to stop grading their property because they had not applied to the Association's Architectural Committee for approval of the grading work.

L.     PRETRIAL DISCUSSIONS

Judge Holmes presided over the trial and pretrial motions. On July 12, 2010, the trial court ordered the parties to work together to create jury instructions and a special verdict form, prior to the jury being selected. On July 15, the parties submitted proposed instructions. The court issued a ruling on the proposed instructions. The parties also presented the trial court with a joint special verdict form.[4] The trial court commented, "[T]his is the longest special verdict form I have ever seen, but that may not be a bad thing. I'm trying to convince myself."

On July 19, the trial court and the parties finalized the instructions. The court discussed the special verdict form and the various changes proposed by the parties. Eventually, the trial court validated the special verdict form that was submitted in the days prior to July 19. The special verdict form was 20 pages long and included 92 questions.

---

[4] The reporter's transcript reflects the special verdict form was discussed on July 7, 2010. The register of actions reflects the special verdict form was discussed on July 16, 2010.

M.     TRIAL

During trial, Siggard testified that the Hudacks trespassed and encroached on the northwest corner of his property by constructing a road that entered three or four feet onto his property and went a distance of approximately 100 feet along his property. Siggard was unsure the value of the damages caused by the alleged trespass and encroachment, but asserted he was unable to use the portion of his property that was encumbered by the road.

Siggard asserted the Hudacks created a nuisance on his property by "intentionally and maliciously [tying his] property up so that [he] could not sell it, could not use it, and caused [him] to lose his property." Siggard also asserted the Hudacks created a nuisance by causing him to be unable to plant 200 avocado trees. Siggard testified he was not aware of the Hudacks creating an unhealthful condition on his property. Siggard estimated the damage for the nuisance to be "[i]n excess of a million dollars." Siggard based the estimate on "[t]he value of the lot at the time it was tied up, as opposed to what was owed at the time it was ti[ed] up." Siggard believed the Hudacks should pay for the various expenses he incurred, for which he was unable to recover due to being unable to sell the property, such as the money spent on property taxes, engineering plans, and grading. The million dollars also included the time Siggard spent representing himself as an attorney in the Hudacks' case—time that Siggard could have spent earning money. Siggard appeared in pro per until approximately 60 days before trial.

In regard to his intentional infliction of emotional distress claim, Siggard testified that he suffered "[s]leeplessness, suicidal thoughts, homelessness, lack of prestige in the community, [and] slander." Siggard said he did not receive medical treatment for these issues because he was unable to afford such treatment. Siggard testified he had been homeless for approximately one year and was homeless at the time of trial.

N.    INSTRUCTIONS

The trial court gave the jury the following instructions concerning Siggard's damages: "Now, here are the specific items of economic damages claimed by Cross-Complainant [] Siggard: The Christensen survey; the cost of grading in 2006; number 3, the cost of the agricultural exception to the grading permit; number 4, the harm to [] Siggard's property. To recover damages for harm to property, [] Siggard must prove reasonable out-of-pocket loss, and the cost of repairing the harm. To determine whether out-of-pocket loss and the cost of repairing [the] harm is reasonable, you must decide if there's a reasonable relationship between the cost of repair and the harm caused by the Hudacks' conduct. You must consider the expense and time involved to restore the property to its original condition compared to the actual value of the property. If you find that the cost of repairing the harm is not reasonable, you may award any reduction in the property's value; and the fifth item of economic damages claimed by [] Siggard, the loss of use of his property. To recover damages for the loss of use, [] Siggard must prove the benefit obtained by the Hudacks because of their wrongful occupation."

O.     CLOSING ARGUMENT

During Siggard's closing argument, Siggard's attorney, Craig Rossell (Rossell), argued the Hudacks "committed a gross nuisance as towards [] Siggard, because they interfered with his loss and enjoyment of the property and life. That's what nuisance is."

In regard to economic damages, it appears from the record Rossell was referring to a document, slide, or other projected image while presenting his argument. Rossell argued: "Damages of [] Siggard, economic damages. There's the purchase price, and here is the 2003 development expense, and we broke that out ever so slightly. Then there's the 2006 surveying expense, and there's the 2006 grading with [Contractor]. Then, there's some more expense of 2006, LSA, and the [storm water pollution prevention plan], that wasn't necessary. Mr. Miller testified it wasn't necessary. The conservation plan that was already in the original application was sufficient. That's what he told us, and yet [] Siggard was given notice [of] violation as a result of [Larry]'s excessive campaign to discredit him. He incurred another $11,000 for a [storm water pollution prevention plan], and he only needed one or the other. We have erosion control materials that were laid down in 2006. We have lost equity on the parcel. How do we get at that? We take the Noble Tucker fair market value estimate, and we back out what was owed. [] Siggard originally said three and a quarter. [McKellogg] corrected him. It was 364. So we took the right number and we backed it out, and we got 236. Then we have property taxes for an eight year period, homeowner fees for that same period, and it gives us a total of $462,200. That's what we claim his

28

out-of-pocket damages are for interference, loss of use and enjoyment of the property, property rights and life. That's the economic part."

P.    VERDICT

First, the jury found Siggard encroached on the Hudacks' property, but the encroachment was not a substantial factor in causing harm to the Hudacks. Second, the jury found Siggard trespassed on the Hudacks' property and that the trespass was a substantial factor in causing harm to the Hudacks; however, the jury concluded Siggard did not intend to harm the Hudacks. Third, the jury found Siggard was negligent, but concluded Siggard's negligence was not a substantial factor in causing harm to the Hudacks. Fourth, the jury found Siggard's grading activities did not violate a County ordinance. Fifth, the jury found Siggard did not create a private nuisance.

Sixth, the jury found the Hudacks encroached on Siggard's property, but they did so with Siggard's permission. Seventh, the jury found (a) the Hudacks created a condition that was harmful to health; which (b) interfered with Siggard's use or enjoyment of his land; (c) a reasonable person would have been annoyed or disturbed by the Hudacks' conduct; (d) the Hudacks' conduct was a substantial factor in causing harm to Siggard; and (e) the seriousness of the harm to Siggard outweighed the public benefit of the Hudacks' conduct. Eighth, the jury concluded Marianne conspired with Larry to injure Siggard. Ninth, the jury found the Hudacks engaged in trespass and nuisance with malice, oppression, and fraud. For the nuisance cause of action, the jury awarded Siggard $437,200 for economic losses and nothing for non-economic losses. The jury awarded Siggard punitive damages in the amount of $167,500.

Q.      MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

On November 12, 2010, the Hudacks filed a motion for a judgment notwithstanding the verdict (JNOV). The Hudacks asserted Siggard's private nuisance cause of action was "focused exclusively on the Hudacks' communications with public officials and the CEQA cause of action." The Hudacks argued that their communications were "absolutely privileged" due to the litigation privilege. The Hudacks reasoned that since Siggard's nuisance claim was "based solely on the Hudacks' right to access the courts[, n]o admissible evidence supports this cause of action and it cannot stand."

The Hudacks argued the issue was already settled when Judge Cahraman ruled on their anti-SLAPP motion. The Hudacks argued Siggard's nuisance claim was a "'back door'" method of introducing "improper evidence," after the anti-SLAPP ruling.

Judge Holmes ruled on the Hudacks' JNOV motion. In denying the motion, the trial court wrote, "A preliminary ruling on an anti-SLAPP motion does not amount to an exclusionary rule. Substantial and relevant evidence at trial proved a cause of action not affected by the SLAPP ruling, and no law precluded its introduction and consideration by the jury. Much more evidence was adduced showing the Hudacks' misconduct than just communications to public officials: among other things, there were repeated contacts about [] Siggard with [the] Association officials and other neighbors, some 60 emails to these and other individuals, and threats made to the whole La Cresta community shown at trial."

30

R.    MOTION FOR NEW TRIAL

On November 22, 2010, the Hudacks filed a motion for new trial.  First, the Hudacks asserted there was a "fatal inconsistency between [an] instruction and [the] special verdict" form.  The Hudacks pointed out that the private nuisance instruction defined a nuisance as occurring if the Hudacks or Siggard interfered with one another's "comfortable enjoyment of life or property," while the special verdict form asked the jury whether Siggard's interference created a condition that was harmful to the Hudacks' health.  The Hudacks argued that their private nuisance cause of action "was not premised on a contention that Siggard created a condition that was harmful to their health," and the jury was not instructed on the health issue, so therefore the "inconsistency renders the verdict 'against law' and mandates a new trial against Siggard."

Second, the Hudacks' argued "the jury was improperly allowed to second guess the portion of the judgment in this case finding that Siggard's grading violated [County] Ordinance 457," which concerned grading.  The Hudacks pointed out that the first question on the special verdict form for the nuisance per se cause of action was whether Siggard's grading activities violated County Ordinance 457.  The jury found Siggard's grading did not violate the ordinance.  The Hudacks argued this was problematic because the violation of the ordinance was res judicata or law of the case, because Judge Cahraman wrote in his ruling, "'In March of 2006, [Siggard] obtained an agricultural exemption f[ro]m the requirement of a grading permit, pursuant to Riverside County Ordinance 457.  Respondent County conducted no CEQA review whatsoever prior to

31

granting that exemption. . . .["]  (Italics omitted.)  The Hudacks asserted Judge Cahraman's ruling granting the writ was "fully conclusive" on the finding that Siggard violated County's ordinance because "Siggard had no grading permits and did not have a valid exemption."

Judge Holmes ruled on the motion for new trial.  In the trial court's ruling it wrote:  "Judge Cahraman's writ of mandate was directed to the County of Riverside based on what he found to be its violation of the California Environmental Quality Act.  He did not find that Siggard's grading violated County Ordinance 457, and there was conflicting evidence presented on that point.

"Based on all the evidence presented to the jury over the weeks of trial, it could well have heeded the [private nuisance jury instruction] and still rendered its same verdict.  Further, all counsel approved both the instruction and the special verdict form, and no objection was made when the verdict was read out by the courtroom assistant."

## DISCUSSION

### A.    PRIVATE NUISANCE

#### 1.    *CONTENTIONS*

The Hudacks contend the trial court erred by denying their JNOV motion because the evidence supporting Siggard's private nuisance cause of action was the same evidence Judge Cahraman found to be protected communications when ruling on the anti-SLAPP motion.  Additionally, under the same point heading, the Hudacks assert "substantial evidence" does not support the private nuisance verdict because "communicative acts" cannot form "the sole basis of liability for private nuisance" on

32

land.  (Cal. Rules of Court, rule 8.204 [separate headings].)  We disagree with both contentions.

## 2. *PROTECTED COMMUNICATIONS*

We begin with the Hudacks' assertion that the trial court erred by denying their JNOV motion because the court "completely ignored Judge Cahraman's prior holding that all of the alleged communication and conduct by the Hudacks, as a matter of law, was 'permissible communications and conduct in pursuit of the right to petition.'"  It appears the Hudacks are raising the following argument:  The court determined, in the anti-SLAPP ruling, that the Hudacks' communication and conduct was protected activity; therefore, any evidence that was brought up in that anti-SLAPP motion could not be used in the trial, because it was determined to be privileged and that ruling bars any contradictory evidentiary ruling.

Typically we review denials of JNOV motions for substantial evidence; however, if an issue raises purely legal questions then we apply the de novo standard of review. (*Wolf v. Walt Disney Pictures and Television* (2008) 162 Cal.App.4th 1107, 1138.)  The Hudacks' contention raises a legal issue, so we apply the de novo standard.

The Hudacks' argument is not persuasive because it fails to take into account the second prong of the anti-SLAPP analysis.  An anti-SLAPP analysis has two prongs (1) is the defendant's alleged activity protected, and (2) is there a probability the plaintiff will prevail on the claim?  (Code Civ. Proc., § 425.16, subd. (b)(1).)  The Hudacks' argument concerns only the first prong.  They assert the activity is protected and therefore the evidence cannot be used at trial.  The Hudacks have forgotten the

33

second prong requiring the issue to be reconsidered for each cause of action. An anti-SLAPP ruling is not a blanket finding that evidence must be excluded throughout trial. As the trial court noted, an anti-SLAPP ruling is not an evidentiary ruling. However, even if it were an evidentiary ruling, the second prong would require an analysis to be performed for every cause of action.

For example, if the anti-SLAPP analysis in this case resulted in a finding that the evidence was protected, but Siggard had a probability of prevailing on his defamation cause of action, then the evidence could have been admitted to prove defamation despite the activity being protected—a finding of protected activity under an anti-SLAPP analysis does not mean evidence is automatically excluded. Parties must meet both prongs of the anti-SLAPP analysis and then the court will strike "*the cause of action.*" (§ 425.16, subd. (b)(1), italics added.) Evidence is not stricken under an anti-SLAPP analysis, but even if it were, it would be for a single cause of action—not an entire complaint or trial.

The Hudacks argue that the "e-mail evidence was insufficient as a matter of law to survive the anti-SLAPP motion, and since Siggard did not appeal from that ruling, he cannot use it now to support a private nuisance cause of action." As set forth *ante*, Siggard did not need to file an appeal to the anti-SLAPP motion in order to use the evidence at trial for a cause of action that was not stricken by the anti-SLAPP ruling. Thus, we find the Hudacks' argument to be unpersuasive.

The Hudacks assert that the evidence was protected by the litigation privilege (Civ. Code, § 47, subd. (b))[5] in addition to being protected by the anti-SLAPP ruling. The Hudacks discuss the fact that they raised objections to the evidence in the trial court, give a record citation to closing arguments, and conclude the evidence is privileged. The Hudacks' argument concerning the litigation privilege is not persuasive because it is not clear exactly which objections they believe should have been sustained. The record citation to closing argument is to a page where no objections were raised. Thus, it is unclear exactly what the Hudacks wish this court to analyze in regard to the objections and the possible connection with the litigation privilege. (Cal. Rules of Court, rule 8.204(a)(1)(C) [provide record citations].)

### 3. *SUBSTANTIAL EVIDENCE*

We now turn to the Hudacks' contention that substantial evidence does not support the jury's private nuisance finding because the evidence reflects the Hudacks' interference was due to communicative acts, not a condition on Siggard's land.

"Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible, and of solid value. Under the substantial evidence standard of review, we view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence, and must affirm the judgment if an examination of the

---

[5] All further statutory references are to the Civil Code unless indicated.

35

entire record viewed in this light discloses substantial evidence to support the judgment. [Citations.]" (*Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1223.)

A nuisance is defined as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . ." (§ 3479.)

Thus, a nuisance is an "interference with the private use and enjoyment of land. [Citation.] In distinction to trespass, liability for nuisance does not require proof of damage to the plaintiff's property; proof of interference with the plaintiff's use and enjoyment of that property is sufficient. [Citation.]" (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 937.)

The Hudacks' communications regarding Siggard's property were so overwhelming and overbearing that they interfered with Siggard's use and enjoyment of his property. In 2001, when Siggard scraped his lot to remove weeds and ruts in the roads, Larry complained to the Association. The Association sent Siggard a letter cautioning him against violating the CC&Rs. Complaints were also filed with County. Siggard was cited by County, but then the citation was dismissed.

In 2006, Siggard obtained an agricultural exemption for grading his property. Siggard planned to plant trees, remove brush, and make the roads on the property passable. The day Larry noticed the grading work, he told Marianne to contact the

Association, and Larry went to Siggard's property to investigate, but he did not speak to Siggard. When the Association assured the Hudacks that Siggard's work was approved by County, the Hudacks continued to monitor Siggard's activities. After two and half weeks, Larry contacted County's Code Enforcement Unit and the Association about Siggard's grading activities. The Association sent Siggard a cease and desist letter, but after Siggard spoke to the Association's attorney and referred the attorney to the agricultural exemption filed with the Association's management office, the Association did not file for an injunction against Siggard.

The Hudacks' attorney also sent Siggard a cease and desist letter. Siggard contacted the Hudacks' attorney, but he had already been fired. Larry wrote a letter to the Association; Larry presented a theory that Siggard's agricultural exemption was a ruse; Larry sent this letter to the Association after County had informed Larry that Siggard was working within his agricultural exemption. Thus, despite being informed by County that Siggard was acting within his exemption, Larry continued to complain about Siggard's work to an administrative body that could potentially disrupt Siggard's activities. Larry threatened to sue the Association if it did not join him in his fight against Siggard.

When the Association informed Larry that it would not be joining his lawsuit against Siggard, Larry told the Association, "The gloves are off. We'll see you in court." It can be inferred from this evidence that no matter what happened with Siggard's property, the complaining was going to continue, and it did. On May 22, 2006, the director of County's Building and Safety Unit sent an e-mail to Larry

informing him that his claims against Siggard would be investigated, but that the investigation would require "some time to process due to very specific notification requirements." Larry went on to contact the agricultural commissioner, the Code Enforcement Unit, a County Supervisor, the California Environmental Protection Agency, and the California Department of Fish and Game. Larry also contacted the Contractors State License Board, accusing Contractor of grading without a permit and asking the licensing board to inquire into the status of Contractor's contracting license. Larry also took over 1,000 photographs of Siggard's property. Larry wrote in a declaration, "I took hundreds of pictures; in some cases on a daily basis." Larry never tried to speak to Siggard after the sale of Siggard's property fell through in 2003.

It can be reasonably inferred from this evidence that the Hudacks became locked into a position of complaining to every possible agency about Siggard's activities, despite having already been told by County and the Association that Siggard was working within his agricultural exemption. So everything Siggard did on his property would lead to complaints and investigations by various administrative agencies. Siggard either had to do exactly what the Hudacks wanted done or face endless administrative investigations, because even if Siggard was acting within County's rules, the Hudacks were going to continue filing complaints.

Since the Hudacks created an administrative barrier to Siggard performing work on his property the jury could reasonably conclude that the evidence supported a finding Larry interfered with Siggard's use and enjoyment of his property, because everything Siggard did on the property—even the work that was approved by County—resulted in

administrative complaints to the point where Siggard had few options for proceeding with his property, as evinced by the property being lost in foreclosure.

In Siggard's respondent's brief, he "concedes that the judgment against the Hudacks cannot be based on conduct that is subject to the official-proceedings or litigation privilege created by Civil Code section 47, subd[ivision] (b)." It is unclear exactly what documents Siggard is conceding should be excluded because the concession is not supported by document titles, dates, or record citations. The obscurity of Siggard's concession is complicated by the fact that no objections were raised to some of the evidence that could have possibly fit within the litigation privilege, thus making it difficult for this court to "reverse engineer" Siggard's concession by looking though the record.

For example, at trial, when Rossell asked to move into evidence a complaint Larry filed with the California Environmental Protection Agency against Siggard in May 2006, McKellogg explicitly said on the record, "No objection." As a second example, when Rossell sought to move into evidence an e-mail Larry sent to the director of County's Building and Safety Department in May 2006 concerning Siggard's grading activity, McKellogg again said on the record, "No objection."

If the litigation privilege is not raised, then it is waived. (*G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 619.) Since the parties are not (1) directing the court to a location in the record where the litigation privilege was raised as an objection to the evidence and allegedly improperly overruled, and (2) providing reasons as to why the ruling was improper, we cannot determine the applicability of the litigation privilege.

(Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)  As a result, we are not persuaded that the litigation privilege applies in this case, because we have not been presented with a proper argument concerning the privilege.  Since we cannot determine to what evidence Siggard's concession pertains, we find his concession to be fairly meaningless.

We now turn to the Hudacks' arguments.  First, the Hudacks assert substantial evidence does not support the judgment because communicative acts cannot form the sole basis for nuisance liability, because communications are not an interference with land.  The Hudacks' argument is not persuasive because they fail to appreciate the consequences of their communicative actions.  The Hudacks' communications do not exist in a vacuum.  The communications had consequences, which resulted in Siggard being prevented from using and enjoying his property in a manner he saw fit, even when the use was approved by County.

Second, the Hudacks argue there is no case precedent for communicative acts providing the basis for nuisance liability.  In *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1099 through 1100, our Supreme Court considered challenges to a criminal street gang injunction that was based upon California's civil public nuisance statutes.  One method of creating a public nuisance is to create "'an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . .'"  (*Id.* at p. 1120.)  Our Supreme Court concluded people in the community were "routinely obstruct[ed]" from using "their own property," i.e. private property, by the gang members "drinking, consumption of illegal drugs, *loud talk*, loud music, vulgarity, *profanity*, brutality, fistfights and gunfire."  (*Id*. at p. 1120, italics

40

added.)  Thus, there is case law providing that a nuisance finding can be based upon communicative acts.  Accordingly, we find the Hudacks' argument to be unpersuasive, because in particular situations, communication can have the consequence of preventing a person from using and enjoying his land.[6]

Third, the Hudacks assert substantial evidence does not support the nuisance judgment because "Judge Cahraman had previously held that all of the alleged communication and conduct by the Hudacks was 'permissible communications and conduct in pursuit of the right to petition.'"  The Hudacks cite to the portion of the record wherein Judge Cahraman issued a ruling on the anti-SLAPP motion.  As explained *ante*, an anti-SLAPP ruling is not an evidentiary ruling.  Thus, Judge Cahraman's ruling at the anti-SLAPP hearing does not explain why there was a lack of substantial evidence at trial.

Fourth, the Hudacks assert there is a lack of substantial evidence because Siggard testified the Hudacks did not create an unhealthful condition on his property.  The Hudacks do not cite any law to support this argument; however, we infer they are

---

[6] Private nuisance law provides:  "'So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance.'" (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 302.)  Thus, we are not interpreting the Supreme Court's rule as providing that *any* communication can form the basis for nuisance liability, because a plaintiff would still need to prove the element of "unreasonableness" under an objective-person standard.  The Hudacks do not discuss the element of "unreasonableness," rather, they focus on the element of "interference."  Moreover, it is important to note that we were not presented with a proper argument concerning the litigation privilege or any argument concerning the First Amendment.  The Hudacks did not include Siggard's nuisance cause of action in their anti-SLAPP motion.

referring to the following definition: "Anything which is injurious to health or an obstruction to the free use of property is a nuisance. (Civ. Code, § 3479.)" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 979.)

On the special verdict form, the jury was asked: "Did the Hudacks create a condition that was harmful to health?" The jury responded, "Yes." The jury was then asked, "Did this condition interfere with Siggard's use or enjoyment of his land?" The jury responded, "Yes."

At trial, when Siggard was being questioned by McKellogg, the following exchange occurred:

"[McKellogg]: So as far as these what we call non-economic damages, you didn't see a doctor. Did you ever take any special medication for these conditions?

"[Siggard]: No, I have not.

"[McKellogg]: Ever get any prescription medication to deal with these conditions that you've described?

"[Siggard]: No, I have not.

"[McKellogg]: Did the Hudacks create some kind of condition on your property that was unhealthful to you?

"[Siggard]: You mean physical?

"[McKellogg]: Yeah. Something that was harmful to your health?

"[Siggard]: Not that I'm aware of."

It is unclear from the questions whether McKellogg asked Siggard (1) whether the Hudacks created a *physical condition* on Siggard's property that was unhealthful to

42

Siggard, or (2) whether the Hudacks created a condition on Siggard's property that was unhealthful to Siggard's *physical wellbeing*, as opposed to his emotional or mental wellbeing. Since the question is unclear, Siggard's answer, "Not that I'm aware of," is ambiguous. It is unclear if Siggard is saying there was not a condition on his property, or if he is saying the condition on the property was not harmful to his physical wellbeing.

Under the substantial evidence standard of review we must resolve all conflicts in the evidence and draw all reasonable inferences in support of the verdict. (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1402.) Under this rule, we must interpret Siggard's ambiguous testimony as reflecting there was a condition on his property, but it was not harmful to his physical wellbeing. This inference is supported by the fact that prior to this "physical" line of questioning, McKellogg was questioning Siggard about his medications and prescriptions—it makes it more reasonable that the question and answer concerned Siggard's health. Accordingly, we find the Hudacks' argument to be unpersuasive.

B.    ORDINANCE VIOLATION

1.    *PROCEDURAL HISTORY*

In the Hudacks' second amended complaint, their first cause of action concerned an allegation of a CEQA violation, pertaining to all the defendants. In the first cause of action, the Hudacks asserted Siggard obtained an agricultural grading exemption, but exceeded the scope of that exemption when grading his property. The Hudacks alleged County failed to perform a CEQA analysis of Siggard's project. Therefore, the

43

Hudacks asked the trial court to issue a writ of mandate (1) setting aside the agricultural exemption, (2) directing County to prepare an environmental impact report, and (3) awarding attorneys' fees and costs to the Hudacks. The Hudacks also requested (1) a judgment prohibiting Siggard from applying for "discretionary land use approval for the Property for a period of five (5) years pursuant to [County] Ordinance 457"; and (2) a judgment requiring Siggard to restore the property to its original condition prior to the grading.

When Judge Cahraman issued the ruling on the Hudacks writ petition, he wrote the following in the "Introduction" section of the written ruling: "In March of 2006 [Siggard] obtained an agricultural exemption from the requirement of a grading permit, pursuant to Riverside County Ordinance 457. Respondent County conducted no CEQA review whatsoever prior to granting that exemption. [The Hudacks] challenge that decision and assert that CEQA covers the decision in question." In the "Ruling" section, Judge Cahraman wrote: "Judgment shall be entered in favor of petitioners on the first cause of action." The trial court ordered County to "(1) vacate and set aside its approval of the agricultural exemption to the permit requirements; and (2) take such actions as may be necessary to bring the project into compliance with the California Environmental Quality Act, sections 21000, *et. seq.*, of the *Public Resources Code*." The ruling was issued on May 22, 2007.

The Hudacks requested their other remedies also be granted, in addition to the writ. Judge Cahraman held a hearing on the Hudacks "additional remedies" motion. The trial court denied, without prejudice, the Hudacks' request to preclude Siggard from

44

obtaining land use approvals. On February 7, 2008, the trial court appointed a referee. The trial court ordered the following factual question be resolved: "What remedial action, if any, should [] Siggard be required to perform with regard to the changes he made to his land? The analysis should be based on the environmental damage done and its effect on the Hudacks, if any."

On August 6, 2009, the Hudacks filed their fifth amended complaint. County was not listed as a defendant in the fifth amended complaint. The first cause of action in the fifth amended complaint was an allegation of a CEQA violation against Siggard and the Ochoas. In the first cause of action, the Hudacks alleged judgment was entered in their favor on this cause of action but the court "reserved jurisdiction to make further remediation orders."

Siggard demurred to the Hudacks fifth amended complaint arguing that CEQA "does not specifically authorize an injunction in order for a property owner to return [a] property to a pre-graded state." Siggard asserted the appropriate remedy under CEQA was for County to conduct an environmental review.

Judge Schwartz ruled on the demurrer. The trial court concluded CEQA did not grant the court authority to issue an injunction ordering Siggard to return the property to its pregraded condition. The trial court reviewed the referee's report and noted that restoration of the property was never found to be required by CEQA in that an environmental impact report was never prepared. The court concluded it had the authority to stop the grading, but ordering restoration would be problematic because it would be a second project occurring on the property without an environmental impact

45

report.  The court held the proper remedy would be "to remand the project back to the lead agency to conduct the appropriate review."  The trial court sustained the demurrer to the Hudacks' CEQA cause of action without leave to amend.

The parties presented the trial court with a joint special verdict form.  When reviewing the verdict form, the trial court said it would place the titles of the causes of action, from the verdict form, on a single sheet of paper to have available for ruling on relevance objections.  The trial court told the attorneys, "[I]f it turns out not to be adequate on your cross-complaint or on the complaint, let me know with a short submittal.  I don't care what form you use.  Individually.  I'm not asking you to do this as joint, but if there's something more in the case than is reflected here in the titles, let me know.  This will be easier for me than using the complaint and trying to figure out what's left in the complaint."

On July 19, the trial court and the parties discussed the special verdict form and the various changes proposed by the parties.  The parties discussed the issue of how Contractor was presented, as an individual or a corporate entity.  The trial court instructed the attorneys to work it out together.  McKellogg said, "We'll work on that at lunch, Your Honor."  When the parties reconvened after the noon recess, Rossell and Contractor's attorney explained that McKellogg wanted "a whole set of questions aimed directly at Ryan Monteleone," as an individual.  The trial court validated the joint special verdict form that was originally submitted.

During closing arguments, McKellogg argued:  "[D]id [] Siggard violate Riverside County Ordinance 457 because he needed a grading permit?  He didn't get

one.  You've heard excuses why he said he didn't need one, but if you find, based on the testimony of the other witnesses, that there was a need for a grading permit, and he didn't have it, and he was using this Agricultural Exception as basically a cover for not getting the grading permit, then your answer to these Nuisance Per Se questions are going to be 'yes.'"  McKellogg went on to argue the evidence, such as the testimony of a code enforcement officer, asserting it showed Siggard violated County Ordinance No. 457.

On the Hudacks' nuisance per se cause of action against Siggard, the special verdict form read:

"12.  Did Siggard's grading activities violate Riverside County Ordinance 457?

"_____ Yes  _____ No

"If your answer to Question 12 is yes, then answer Question 13.  If you answered no, go to Section D, and recommence at Question 19."

Question 19 concerned the Hudacks' private nuisance cause of action.  The jury marked the "no" option for Question No. 12, and therefore skipped over the other questions concerning the nuisance per se cause of action, such as, "Did this condition interfere with the Hudacks' use or enjoyment of their land?"

In the Hudacks' motion for new trial, they argued, "the jury was improperly allowed to second guess the portion of the judgment in this case finding that Siggard's grading violated [County] Ordinance 457," which concerns grading.  The Hudacks argued the violation of the ordinance was res judicata or law of the case, due to Judge Cahraman's writ ruling.  The Hudacks asserted Judge Cahraman's ruling granting the

writ was "fully conclusive" on the finding that Siggard violated County's ordinance because, "Siggard had no grading permits and did not have a valid exemption."

Judge Holmes ruled on the motion for new trial: "Judge Cahraman's writ of mandate was directed to the County of Riverside based on what he found to be its violation of the California Environmental Quality Act. He did not find that Siggard's grading violated [County] Ordinance 457, and there was conflicting evidence presented on that point."

## 2. *ANALYSIS*

We are now addressing the lawsuit wherein the Hudacks were suing Siggard and Contractor. The Hudacks contend a new trial is necessary because the jury should not have been permitted to consider the question of whether Siggard violated County Ordinance No. 457, because that issue was settled by Judge Cahraman's writ ruling and therefore principles of res judicata applied to the finding. Siggard asserts the Hudacks have waived this contention because they did not object to the special verdict form on this basis at trial court.

We agree with Siggard that the issue was waived due to the Hudacks' failure to object. Since the special verdict form was prepared jointly by the trial attorneys it could also fall within the doctrine of invited error. (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.) As to the waiver issue, the relevant rule is: "'An appellate court will not consider procedural defects or erroneous rulings where an objection could have been but was not, raised in the court below.' [Citation.] It is unfair to the trial judge and to the adverse party to take advantage of an alleged error on appeal where it

could easily have been corrected at trial.  [Citations.]"  (*Children's Hosp. and Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 776-777.)

In this case, the trial court asked the attorneys to inform the court if the special verdict form was inadequate.  The trial court also listened to objections to the special verdict form. The Hudacks did not object on the basis raised here.  The issue could have been easily resolved by removing or redacting the question from the special verdict form.  Since the Hudacks waited until after trial to raise this verdict form issue, we deem the issue to be waived.

The Hudacks assert they did not waive this issue because they raised it after trial, in their motion for a new trial.  For the sake of thoroughness, we will address the merits of the Hudacks' contention.  However, we must address one more procedural problem, which is that the Hudacks have not provided any law to support to their argument.  The Hudacks use the legal terms "res judicata" and "law of the case," so we infer those are the legal theories on which their contention is based.

"'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.)  Judge Cahraman's ruling concerned the cause of action for an alleged CEQA violation.  The jury question pertained to a cause of action for nuisance per se.  Since the same cause of action was not being relitigated, we conclude the Hudacks' reliance on the doctrine of res judicata is not persuasive.

"The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.) The Hudacks' contention concerns an alleged trial court finding, not a case or statute that was misinterpreted. Accordingly, the Hudacks' reliance on the law of the case doctrine is not persuasive.

Although not mentioned in the Hudacks' appellants' opening brief, we infer they perhaps meant to rely on the law of collateral estoppel/issue preclusion, which "'"precludes relitigation of issues argued and decided in prior proceedings.' [Citation.]" (*Mycogen Corp. v. Monsanto Co.*, *supra*, 28 Cal.4th at p. 896.) The Hudacks raise the following reasoning in support of their argument: "Judge Cahraman necessarily found that Siggard violated [County] Ordinance 457 because his exemption was invalid."

In Judge Cahraman's writ ruling, he directed County to invalidate Siggard's agricultural exemption, which would have the direct result of stopping Siggard's project from going forward. Judge Cahraman's reason for this order was that a proper CEQA analysis had not been performed. Judge Cahraman's decision was not based upon a finding that Siggard had exceeded the scope of his agricultural exemption or otherwise violated the administrative grading permit process of County Ordinance No. 457. The reason for invalidating the exemption was to stop the grading from taking place in order

to prevent the CEQA violation from continually compounding—not because the court found a County ordinance was being violated.

We note that County Ordinance No. 457.103 amended Section 3309.1 of the Uniform Building Code to reflect, "Unless exempted by the California Environmental Quality Act of 1970, no application for a permit for grading shall be accepted unless accompanied by a completed Environmental Assessment Form, and no grading permit shall be issued thereon until all procedures under those rules including the preparation of a final Environmental Impact Report, if required, have been completed." (Riverside County Ordinance No. 457.103, § 4(J)(5).)[7] However, there is nothing indicating the trial court's decision was based on this County amendment. Rather, as set forth *ante*, it appears the trial court's decision was based on state laws (not a local ordinance), as it is the Public Resources Code and Code of Regulations that are heavily cited in the "Reasons" section of the trial court's ruling. The County Ordinance is cited only to discuss the discretionary versus ministerial nature of granting an agricultural exemption. Since the issue of whether Siggard had violated County Ordinance No. 457 had not been decided by Judge Cahraman's writ ruling, we find no error in the verdict form.

C.     JURY INSTRUCTION

1.     *PROCEDURAL HISTORY*

During closing arguments, McKellogg argued Siggard created a nuisance by damming the spring that gave water to the oak trees on the Hudacks' property, creating

---

[7] http://www.clerkoftheboard.co.riverside.ca.us/ords/400/457.pdf, as of October 9, 2013.

dust that entered the Hudacks' property, and causing there to be noise on the Hudacks' property.

The trial court ordered the parties to work together to create jury instructions. The parties submitted proposed instructions. The parties and trial court discussed the proposed instructions. During the discussion the trial court talked about California Civil Jury Instruction No. 2021, which sets forth the elements of nuisance. The trial court suggested different wording for one of the elements saying, "I think that should be 'one's conduct was a substantial factor in causing the other's harm.'" Rossell responded, "Sure." The trial court also suggested changing the wording in the instruction's introduction. The introduction was meant to let the jury know Siggard and the Hudacks both had private nuisance causes of action, so the instruction pertained to both parties' claims. The trial court said, "Let's say it better. Let's just say as to [the Hudacks] and as to Siggard. Does that do it?" Rossell responded, "I believe so." The trial court said, "2021 is in."

On July 19, the trial court and the parties finalized the instructions. During that conversation, the parties and court discussed the instruction pertaining to economic damages. (CACI No. 3903.)

California Civil Jury Instruction No. 2021, as given in this case, read: "The Hudacks and Wayne Siggard claim that the other interfered with their use and enjoyment of their land. To establish this claim, each must prove all of the following:

"1. That the one owned the property;

52

"2.  That the other, by acting or failing to act, created a condition that was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property;

"3.  That this condition interfered with the other's use or enjoyment of their land;

"4.  That the one did not consent to the other's conduct;

"5.  That an ordinary person would be reasonably annoyed or disturbed by the other's conduct;

"6.  That the Hudacks were, or [] Siggard was, harmed;

"7.  That the one's conduct was a substantial factor in causing the other's harm; and

"8.  That the seriousness of the harm outweighs the public benefit of the offender's conduct."

As set forth *ante*, the trial court also directed the parties to submit a joint special verdict form.  The discussions about the special verdict form are described *ante*.  Of note, the trial court told the trial attorneys when discussing the special verdict form, "[I]f it turns out not to be adequate on your cross-complaint or on the complaint, let me know with a short submittal.  I don't care what form you use.  Individually.  I'm not asking you to do this as a joint, but if there's something more in the case than is reflected here in the titles, let me know.  This will be easier for me than using the complaint and trying to figure out what's left in the complaint."

The special verdict form for the Hudacks' private nuisance cause of action read:

"19.  Did Siggard, by acting or failing to act, create a condition that was harmful to health?

"____ Yes  ____ No

"If your answer to Question 19 is yes, then answer Question 20.  If you answered no, go to Section E and recommence at Question 27."  Question 27 concerned the Hudacks' cause of action for negligence.  The jury marked the "no" option on Question 19, and therefore did not answer the remaining questions concerning the Hudacks' private nuisance cause of action.

In the Hudacks' motion for new trial, they asserted there was a "fatal inconsistency between [an] instruction and [the] special verdict" form.  The Hudacks pointed out that the private nuisance instruction defined a nuisance as occurring if the Hudacks or Siggard interfered with one another's "comfortable enjoyment of life or property," while the special verdict form asked the jury whether Siggard's interference created a condition that was harmful to the Hudacks' health.  The Hudacks argued that their private nuisance cause of action "was not premised on a contention that Siggard created a condition that was harmful to their health," and the jury was not instructed on the health issue, so therefore the "inconsistency renders the verdict 'against law' and mandates a new trial against Siggard."

Judge Holmes ruled on the motion for new trial.  In the trial court's ruling it wrote:  "Based on all the evidence presented to the jury over the weeks of trial, it could well have heeded CACI 2021 [the private nuisance jury instruction] and still rendered its same verdict.  Further, all counsel approved both the instruction and the special

verdict form, and no objection was made when the verdict was read out by the courtroom assistant." The trial court denied the motion for a new trial.

2. *ANALYSIS*

The Hudacks contend the trial court erred by denying their motion for a new trial because the special verdict form pertaining to the nuisance cause of action asked the jury if Siggard created a condition that was harmful to health, when (1) the jury was not instructed about a condition pertaining to health, and (2) the Hudacks' did not proceed on a theory of the alleged condition being harmful to health.[8]

A verdict may be vacated and a new trial granted if "the verdict or other decision is against law." (Code Civ. Proc., § 657.) "The jury's verdict [is] 'against law' *only if* it [is] 'unsupported by any substantial evidence, i.e., [if] the entire evidence [is] such as would justify a directed verdict against the part[y] in whose favor the verdict [was] returned.' [Citations.]" (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 906, italics added; *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 638 ["In this context, a verdict is 'against law' only if it was unsupported by substantial evidence"]; *Musgrove v. Ambrose Properties* (1978) 87 Cal.App.3d 44, 56 ["The granting of a new trial on the ground that the verdict is against law is authorized only where there is no substantial evidence to sustain the verdict"].)

---

[8] Siggard asserts the Hudacks forfeited this argument by not objecting during the trial and by participating in the drafting of the jury instructions and special verdict form. We choose to address the merits of the Hudacks' argument.

The Hudacks do not present this court with a substantial evidence argument. Rather, they argue about how the language of the jury instruction does not match the language of the special verdict form. The Hudacks assert that since the language does not match the "inconsistency renders the verdict 'against law' and mandates a new trial."

We must follow the definition of "against law" set forth by our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 456.) As set forth *ante*, our Supreme Court has set forth the rule that a verdict is against the law "*only if* it [is] 'unsupported by any substantial evidence" (*Sanchez-Corea v. Bank of America*, *supra*, 38 Cal.3d at p. 906, italics added.) As a result, we would need to be presented with a substantial evidence argument in order to properly consider this issue. Since a substantial evidence argument was not presented, we find the Hudacks' argument to be unpersuasive.

> D.     <u>"OTHER REMEDIES" MOTION</u>

> 1.     *PROCEDURAL HISTORY*

The Hudacks filed their original complaint, initiating the instant case, on May 25, 2006. County was among the named defendants. The causes of action included a CEQA violation. The CEQA cause of action included allegations that all the defendants "should have required an Environmental Impact Report (EIR)" for the grading work done on Siggard's property. The Hudacks requested a "[w]rit of mandamus to require the defendants to recognize that the defendants [*sic*] grading project is subject to CEQA

56

and to require said defendants to comply with the CEQA act [*sic*] and prepare an Environmental Impact Report."

Judge Cahraman granted the writ. The writ directed County to "vacate and set aside its approval of the agricultural exemption to the permit requirements; and (2) take such action as may be necessary to bring the project into compliance with [CEQA], sections 21000, et seq., of the Public Resources Code."

The Hudacks filed a motion requesting a hearing on the additional remedies requested in their second amended complaint concerning the alleged CEQA violation. County was named a defendant in the second amended complaint. In addition to the writ, the Hudacks requested Siggard (1) be required to restore his property to the condition it was in prior to his grading activity; and (2) "be prohibited from seeking any discretionary land use approval for the Property for a period of five (5) years."

County's return to the writ of mandate reflected (1) County invalidated Siggard's agricultural grading exemption; and (2) an additional return to the writ would be filed if Siggard applied for another grading permit or agricultural exemption and County's building department approved the permit or exemption. Judge Cahraman held a hearing on the Hudacks "additional remedies" motion.

The trial court denied, without prejudice, the Hudacks' request to preclude Siggard from obtaining land use approvals. On February 7, 2008, the trial court appointed a referee. The trial court ordered the following factual question be resolved: "What remedial action, if any, should [] Siggard be required to perform with regard to the changes he made to his land? The analysis should be based on the environmental

damage done and its effect on the Hudacks, if any." The trial court ordered Siggard and the Hudacks equally share the cost of the referee.

In September 2009, Siggard demurred to the Hudacks' fifth amended complaint. County was not named as a defendant in the fifth amended complaint. In the demurrer, it was argued that CEQA "does not specifically authorize an injunction in order for a property owner to return [a] property to a pre-graded state." In other words, the remedy the Hudacks were seeking did not comport with the CEQA cause of action. Siggard asserted the appropriate action under CEQA was for County to conduct an environmental review.

Judge Schwartz ruled on the demurrer. County was not present at the demurrer hearing—County was no longer a defendant in the case. The trial court concluded CEQA did not grant the court authority to issue an injunction ordering Siggard to return the property to its pregraded condition. The trial court reviewed the referee's report and noted that restoration of the property was never found to be required by CEQA in that an environmental impact report was never prepared. The court concluded it had the authority to stop the grading, but ordering restoration would be problematic because it would be a second project occurring on the property without an environmental impact report. The court held the proper remedy would be "to remand the project back to the lead agency to conduct the appropriate review." The trial court sustained the demurrer to the Hudacks' CEQA cause of action without leave to amend. The trial court also vacated the scheduled hearing to consider the referee's findings.

## 2.    *ANALYSIS*

### (a)    Contentions

We now turn to the demurrer proceeding between the Hudacks and Siggard. Under a single heading, the Hudacks assert the following: "Judge Schwartz's ruling must be reversed to the extent it held that County fully complied with the writ of mandate solely by vacating the agricultural exemption. That ruling must also be reversed to the extent that it rejected the referee's recommendations in total and dismissed all further CEQA proceedings. County should be ordered to prepare an EIR and assess the impact of the referee's recommendations." In a footnote, the Hudacks contend "[o]rdering an EIR here will not be a hollow gesture. The environmental effects of Siggard's improper grading have never been fully assessed. In addition, the trial court at the end of the case rejected the Hudacks' claim for substantial attorneys' fees incurred in the CEQA proceedings on the theory that no significant public benefit was achieved. [Citation.] Such a public benefit could well have been achieved if the County had been required to bring the project into compliance with CEQA." (Cal. Rules of Court, rule 8.204(a)(1)(B) [separate headings].)

The County asserts the attorneys' fees ruling may be appealable, but Judge Schwartz's ruling cannot be included in the Hudacks' appeal because "lack of notice of any contempt proceedings, the referee appointment was directed at enforcement as to parties other than the County, lack of an appealable written order, lack of compliance with notice of appeal requirements, or untimeliness."

59

We address the Hudacks' contentions in turn. First, the Hudacks' assert, "Judge Schwartz's ruling must be reversed to the extent it held that the County fully complied with the writ of mandate solely by vacating the agricultural exemption." Judge Schwartz ruled on a demurrer to a complaint in which the County was not a named as a defendant. The County was not present at the demurrer hearing. In no manner could Judge Schwartz's ruling be interpreted as ruling on a writ of mandate involving the County, because (1) Judge Schwartz said at the hearing, "The matter is on calendar this morning for a demurrer to the fifth amended complaint"; and (2) the County was not at the hearing. (*Redevelopment Agency v. Tobriner* (1989) 215 Cal.App.3d 1087, 1095 [discussing due process and parties being present at hearings].)

At the demurrer hearing, Judge Schwartz vacated the scheduled hearing to consider the referee's findings. The referee's report grew out of the Hudacks' motion for "additional remedies." It appears only Siggard and the Hudacks participated in the referee's hearing. Thus, it does not appear Judge Schwartz's order vacating the scheduled hearing could be construed as holding the County fully complied with the writ of mandate, because (1) it did not involve a writ of mandate, and (2) it did not involve the County. Accordingly, we reject the Hudacks' premise that Judge Schwartz's ruling could be construed as holding that the County fully complied with the writ of mandate.

(c)     Demurrer

Second, we address the Hudacks' contention that Judge Schwartz's "ruling must also be reversed to the extent that it rejected the referee's recommendations in total and dismissed all further CEQA proceedings." Judge Schwartz sustained Siggard's demurrer to the Hudacks' CEQA cause of action without leave to amend. Notice of the ruling on the demurrer was filed on October 30, 2009. To the extent the Hudacks' wanted to appeal Judge Schwartz's ruling sustaining the demurrer without leave to amend, they needed to obtain a judgment of dismissal pertaining to the order sustaining the demurrer and appeal from that judgment. (*Singhania v. Uttarwar* (2006) 136 Cal.App.4th 416, 425.) In other words, a judgment of dismissal is needed.

It appears from the record that a judgment of dismissal was not entered. The only documents reflecting the demurrer ruling are the (1) reporter's transcript, and (2) register of actions. The Hudacks do cite to a location in the record where judgment was entered pertaining to the demurrer. The demurrer is not mentioned in the final judgment following the jury trial. Moreover, contrary to the point the Hudacks are attempting to assert, i.e. that there was an error concerning the CEQA claim, the final judgment following the jury trial reflects the Hudacks "prevailed on the first cause of action in their complaint," which is the CEQA cause of action. The demurrer ruling is not included in the Hudacks' notice of appeal.

Since (1) there does not appear to be a judgment of dismissal pertaining to the demurrer, and (2) the judgment following the jury trial reflects the Hudacks prevailed on their CEQA cause of action, we lack an appealable judgment in the record pertaining

61

to the demurrer.  (See *Shepardson v. McLellan* (1963) 59 Cal.2d 83, 87-88 ["No mention is made in the judgment entered on the jury verdict of the order sustaining the demurrer.  Thus it was incomplete.  Had it contained a judgment of dismissal in reference to the order sustaining the demurrer then it would have been reviewable on an appeal from that judgment"].)

The Hudacks describe the ruling at the demurrer hearing as an interlocutory order from which they could not have appealed until the final judgment following the jury's verdict.  The Hudacks are correct that an order sustaining a demurrer is an interlocutory order.  (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 780 [Fourth Dist., Div. Two].)  However, the Hudacks are skipping over the step that a judgment of dismissal is needed in order to pursue issues with the demurrer on appeal.  As explained *ante*, there is not a judgment of dismissal in the record, and the judgment following the jury's verdict reflects the Hudacks prevailed on the CEQA cause of action—the demurrer is not mentioned.  Therefore, we do not have a judgment pertaining to the demurrer—the judgment is incomplete.  (See *Shepardson v. McLellan*, *supra*, 59 Cal.2d at pp. 87-88.)

For the sake of addressing the Hudacks' contention, we will deem the final judgment following the jury verdict as reflecting that the demurrer to the first cause of action was sustained without leave to amend, and thus the first cause of action was dismissed, although the Hudacks did prevail on the writ of mandate pertaining to the first cause of action, prior to the sustaining of the demurrer.  Accordingly, we address the Hudacks' assertion that Judge Schwartz's "ruling must also be reversed to the extent

that it rejected the referee's recommendations in total and dismissed all further CEQA proceedings."

Judge Schwartz vacated a hearing concerning the referee's report because he sustained Siggard's demurrer to the first cause of action. The only parties that participated in the referee's hearing were Siggard and the Hudacks. Thus, procedurally, there was nothing to consider in regard to the referee's report because the cause of action, as between those two parties had ended. Judge Schwartz did not rule on the merits of the referee's report, he vacated a scheduled hearing date.

As to dismissing the CEQA cause of action, the Hudacks failed to name the County as a party in the fifth amended complaint. The only parties named as defendants in the CEQA cause of action were Siggard and the Ochoas. Judge Schwartz stated in his ruling that the proper remedy in the CEQA cause of action would be "to remand the project back to the lead agency to conduct the appropriate review." The Hudacks also prevailed against the County in their writ of mandate on the CEQA cause of action. Thus, Judge Schwartz did not dismiss all further CEQA proceedings; rather, it was the Hudacks who chose not to name the County as a defendant in the CEQA cause of action despite having prevailed against the County in a writ petition. In sum, we are not persuaded the trial court erred, because it was the Hudacks' choice to not name the County as a defendant in the CEQA cause of action.

(d)     Attorneys' Fees

Third, the Hudacks contend "the trial court at the end of the case rejected the Hudacks' claim for substantial attorneys' fees incurred in the CEQA proceedings on the

63

theory that no significant public benefit was achieved. [Citation.] Such a public benefit could well have been achieved if the County had been required to bring the project into compliance with CEQA."

The Hudacks raise the foregoing contention in a footnote. There are no legal citations included in the footnote. The Hudacks sought attorneys' fees in the trial court pursuant to Code of Civil Procedure section 1021.5. The person seeking an award of attorneys' fees bears the burden "to establish each prerequisite to an award of attorney fees under [Code of Civil Procedure] section 1021.5. [Citation.]" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry and Fire Protection* (2010) 187 Cal.App.4th 376, 381.)

This court is not inclined to act as cocounsel for the Hudacks' appellate attorney, and furnish meaningful legal arguments concerning how the trial court's ruling on the attorneys' fees motion may have constituted error. (*Doe v. Lincoln Unified School Dist.* (2010) 188 Cal.App.4th 758, 767.) The failure to provide a meaningful legal argument will forfeit the issue on appeal. (*Los Angeles Unified School Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 212.) Since the Hudacks do not provide legal citations or meaningful analysis to support the attorneys' fees contention, we deem the issue to be forfeited.

## III.

## <u>THE HUDACKS AND THE ASSOCIATION</u>

In this section of the opinion, we address the issues pertaining to the Hudacks and the Association.

## FACTUAL AND PROCEDURAL HISTORY

In 2001, Larry and two other homeowners filed complaints with the Association against Siggard. Larry complained Siggard was grading without a permit, building residential pads, creating roads, and affecting a stream. Complaints were also filed with the County. The Association sent Siggard a letter "requesting he cease and desist from performing all work in violation of the Declaration of Restrictions for La Cresta." Siggard replied to the letter "asserting he had made no improvements to the lot." In August 2001, the Association sent Siggard a letter reflecting that it concluded he had not committed any violations because he was "not grading in preparation to build a structure." In that letter, the Association cautioned Siggard that he could potentially violate the CC&Rs concerning drainage if he performed erosion control work.

In 2003, Siggard applied to the Association for approval to construct a bridge, entry gate, and wall, and to grade the property. The Association denied the request to build a gate and wall, but approved the requests for the bridge and grading "on the condition that the property owner obtain any County permits as required."

In February 2006, Siggard sent the Association a letter reflecting "he anticipated receiving a County permit shortly on plans that were substantially the same as those approved on March 15, 2003." In February 2006, the Association granted Siggard an extension on the bridge and grading plans, thus permitting him to grade his property and construct a bridge, but again with the condition that Siggard "obtain any County permits that are required." In March 2006, Siggard obtained his agricultural exemption. On

65

approximately March 25, Siggard submitted his agricultural permit exemption and maps of his grading plans to the Association.

On April 25, 2006, Contractor began grading Siggard's property. Siggard told Contractor to make the roads "accessible," ideally under a 15 percent hill grade. Contractor used a bulldozer to perform the grading work. On approximately May 1, 2006, Larry saw "a really steep cut along [his] property line." Larry instructed Marianne to contact the Chairperson of the Association's Architectural Committee to determine if Siggard had permits and permission to be performing grading work. The Chairperson of the Architectural Committee assured the Hudacks that Siggard had permits and the Committee's approval to perform the grading work.

On May 17, the water in Bear Creek stopped flowing. At that point, the Hudacks questioned the information given to them by the Chairperson. Larry contacted County's Code Enforcement Unit to determine if Siggard had grading permits. Larry discovered no grading permits had been issued to Siggard. Larry contacted the president of the Board and asked him to look at Siggard's property because Larry believed Siggard was violating the bylaws by damming Bear Creek.

On May 17, the Board's president looked at Siggard's property from the property line Siggard shared with the Hudacks. Larry complained that (1) the grading was moving rocks and dirt on to the Hudacks' property, (2) Bear Creek had been disturbed, and (3) a spring that fed oak trees on the Hudacks' property had been rerouted. It appeared to the Board president that "there was debris" on the Hudacks' property and there had been "some disruption" to Bear Creek. The Board president could not

ascertain if the spring had been rerouted. The Board president said "he would see to it that a cease and desist [letter] would be issued" to Siggard.

The Association's attorneys sent a letter to Siggard on May 18. The letter asked Siggard to cease and desist from grading his property because Siggard did not have a grading permit. The letter warned that the Association could file legal action, such as an injunction, against Siggard if he did not stop grading his property. In response to the letter, Siggard called the Board's president, but he would not take Siggard's call. Thus, Siggard sent a letter to the Association's attorney. Siggard wrote that the Association's facts were incorrect, but even if they were correct, the Association failed to state facts sufficient to support a cause of action. In a telephone conversation with the Association's attorney, Siggard referred the attorney to the agricultural grading permit he filed with the Association's management office.

On May 20, 2006, Larry wrote a letter to the Board's president. In the letter, Larry accused Siggard of grading "directly into Bear Creek." Larry theorized that Siggard was using "an agricultural exemption as a ruse or cover story to accomplish land clearing and massive earth movement that would enable him to more favorably present and sell his 10 acre parcel." Larry noted that "Siggard had an Agricultural Exemption and [the County could] not shut him down," but Larry also concluded "Siggard had No PERMITS."

In the letter, Larry faulted the Association for approving Siggard's grading plans without evidence Siggard had "appropriate county permits." Larry asserted Siggard's "grading caused a material and substantial loss of property value for [the Hudacks']

67

adjoining parcels." Larry believed (1) the oak trees on his property would die due to a lack of water from the spring; (2) mud would move onto his property when it rained from the soft dirt piled "within inches" of the Hudacks' property; and (3) the Hudacks' property would flood when it rained due to the damming of Bear Creek. Larry wrote the Association "must consider that [it] will either be a co-defendant or a plaintiff in this case . . . there is no middle ground."

The Board concluded that they would be named in the lawsuit "one way or another," so it decided not to take any particular action since the dispute concerned two property owners within the Association. The Association did not file for an injunction. All of Siggard's significant grading work was completed in May. The Association believed it satisfied any obligations it had in the situation when it sent Siggard the cease and desist letter. When the Board informed Larry that it would not be joining him as a plaintiff against Siggard, Larry replied, "The gloves are off. We'll see you in court."

The Association was not named as a defendant in the Hudacks' original complaint; however, the Association was named as a defendant in the Hudacks' second amended complaint. The Hudacks sued the Association for (1) violating CEQA; (2) breach of fiduciary duty; (3) breach of contract by failing to enforce the CC&Rs; and (4) negligence by failing to enforce the CC&Rs.

The Hudacks' claims rested on the "Accelerated Enforcement" section of the Association's Policies and Procedures. The "Accelerated Enforcement" section provides: "Some violations are of such a character that the routine enforcement procedure is inadequate to protect the Association and property owners because of time

68

delays. <u>In these cases a cease and desist injunction will be sought immediately</u>. [¶] Building or erecting any structure or doing any grading without prior Architectural Committee approval as provided for in Section II of the CC&Rs, is automatically considered of this character."

The Association demurred to the Hudacks' second amended complaint. As to the CEQA cause of action, the Association asserted CEQA did not apply to private parties such as a homeowners' association. In regard to the contract claims, the Association asserted the demurrer should be sustained because the Hudacks failed to cite a provision in the CC&Rs that required the Association to seek an injunction against a homeowner. The Association asserted the "Accelerated Enforcement" section, relied upon by the Hudacks, and was part of the Association's "Policies and Procedures"— not part of the CC&Rs. Therefore, the Association reasoned there could not have been a breach of the CC&Rs. Judge Cahraman sustained the demurrer, without leave to amend, as to the CEQA cause of action and the breach of contract cause of action.

On October 24, 2008, the Hudacks filed their fourth amended complaint. The Hudacks sued the Association for (1) negligence, for not inquiring into the "true facts and circumstances surrounding [Siggard's] permits and authorizations"; (2) negligent misrepresentation, in that the Association told the Hudacks that Siggard had obtained permits for grading his property; (3) fraud and deceit, in that the Association told the Hudacks Siggard had obtained permits for grading his property; and (4) breach of fiduciary duty by (a) authorizing Siggard's grading, (b) not enforcing the CC&Rs,

(c) spending Association funds on horse trails, (d) entering into easement agreements, (e) levying and collecting unreasonable assessments, (f) failing to take legal action against seven other property owners in La Cresta, (g) spending Association funds on an entrance gate; (h) preparing and distributing financial statements that were false and misleading; and (i) claiming that the Architectural Committee's meeting minutes were private documents.

Additionally, in the fourth amended complaint, the Hudacks requested (1) declaratory relief, specifically that the Association's governing documents be declared enforceable as interpreted by the Hudacks; (2) injunctive relief, specifically that the Association be required to enforce the Association's governing documents pertaining to Siggard's property, the entry gate, the horse trails, and the spending of Association funds; and (3) the cancellation of written instruments, specifically the cancellation of easements granted for the purposes of pedestrian, bicycle, and equestrian trails in La Cresta.

The Association moved for summary adjudication on the Hudacks' claims for (1) declaratory relief, (2) injunctive relief, (3) cancellation of written instruments, and (4) breach of fiduciary duty. On September 25, 2009, Judge Schwartz granted the Association's motion for summary adjudication as to all four claims.

A month earlier, on August 6, 2009, the Hudacks filed their fifth amended complaint. The fifth amended complaint included the same causes of action against the Association for (1) breach of fiduciary duty, (2) negligent misrepresentation, (3) fraud and deceit, (4) declaratory relief, (5) injunctive relief, and (6) cancellation of written

70

instruments.  Thus, when the court issued its ruling, it pertained to the fifth amended complaint, which was operative at the time of the hearing on the motion.

The jury found (1) the Association was not negligent; (2) the Association did not make a false representation of important fact to the Hudacks; (3) the Association did not intentionally fail to disclose an important fact that the Hudacks were unaware of and could not reasonably have discovered; and (4) the Association did not engage in the alleged conduct with malice, oppression, or fraud.

The Association moved for an award of attorneys' fees and costs.  The Association's motion was based upon section 1354, which permits the prevailing party to collect attorneys' fees and costs in an action to enforce the governing documents of a homeowners' association.  (§§ 1351, subd. (a), 1354.)  The trial court awarded the Association attorneys' fees.  The record is unclear, but it appears the fee award was approximately $600,000.

## DISCUSSION

### A.     BREACH OF CONTRACT

#### 1.     *PROCEDURAL HISTORY*

In the Hudacks' second amended complaint they cited Section IV(j) of the CC&Rs, which reflects, "Natural surface drainage shall be maintained and no obstruction diversion or confining of the existing channels through which surface water naturally flows upon and across the lot in time of storm shall be made so as to cause damage to other properties."  The Hudacks asserted Siggard breached this section of the CC&Rs by grading his property.

71

The Hudacks alleged the Association "materially breached the Contract by [(1)] failing and refusing to utilize its power and authority to take reasonable action to prevent Defendants from grading"; (2) not enforcing the CC&Rs; (3) not enforcing the "Accelerated Enforcement" section of the Association's "Policies and Procedures"; and (4) not acting in good faith. The "Contract" was alleged to consist of "the CC&Rs, By-Laws and Policies and Procedures" of the Association.

In its demurrer, the Association argued, "The Second Amended Complaint fails . . . to cite to any provision in the CC&Rs that requires the Association to file a lawsuit to enjoin a homeowner's alleged wrongful conduct." The Association asserted it had no duty under the CC&Rs to sue Siggard. The register of actions reflects the trial court sustained the Association's demurrer without leave to amend as to the CEQA and breach of contract causes of action. The minute order in the register of actions does not include reasons for the ruling. The reporter's transcript does not include a transcript for February 21, 2007—the day the court ruled on the demurrer to the second amended complaint.

However, the reporter's transcript does include a record of the trial court's ruling on the Association's demurrer to the Hudacks' First Amended Complaint. When discussing the Hudacks' First Amended Complaint, the trial court said, "I can't find a covenant, a promise to do anything in particular to—to enforce the CC&Rs. I looked. I looked at Paragraph 12 that you asked me to read in your paperwork, sir, and I read it. I'm just not finding a covenant, a promise anywhere in that document that 'we will do.' Sure we have the power to do X, Y, and Z, but a promise that we must."

Notice of the ruling on the demurrer to the Second Amended Complaint was filed on February 27, 2007. It does not appear a judgment of dismissal was entered on the demurrer. The demurrer is not mentioned in the judgment following the jury trial. The demurrer is not included in the Hudacks' notice of appeal. For the sake of addressing the Hudacks' appellate contentions, we will deem the judgment after the jury verdict as including a judgment of dismissal for the demurrer to the second amended complaint.

2.      *ANALYSIS*

The Hudacks contend the trial court erred by sustaining the Association's demurrer to the Hudacks' breach of contract cause of action.

""""A demurrer tests the legal sufficiency of the complaint . . . ." [Citations.] On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.] If no liability exists as a matter of law, we must affirm that part of the judgment sustaining the demurrer. [Citation.]'" (*Balikov v. Southern California Gas Co.* (2001) 94 Cal.App.4th 816, 819.)

"A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for

nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach.  [Citation.]"  (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239.)  "A contract is an agreement to do or not to do a certain thing."  (§ 1549.)  "In a bilateral contract, the promisor and promisee must exchange promises representing binding legal obligations to render the contract enforceable."  (*Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 637.)

In the Hudacks' second amended complaint, they allege CC&Rs, Bylaws, and Policies and Procedures constitute a contract because they were "promulgated to establish a general plan for the protection, maintenance, development and improvement of La Cresta association and all the property owners owning separate interests therein, including Hudack and Siggard."

CC&Rs are equitable servitudes, not contracts.  (§ 1354, subd. (a); see also *Treo @ Kettner Homeowners Ass'n v. Superior Court* (2008) 166 Cal.App.4th 1055, 1066 [CC&Rs have been construed as contracts to provide a means for analysis, but they are actually equitable servitudes]; compare *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 244-246 [distinguishing *Treo* and explaining how an arbitration clause in CC&Rs could be considered to be a promise and agreement].)

A lawsuit can be based upon enforcing an association's "governing documents." (§ 1354, subd. (c).)  "'Governing documents' means the declaration and any other documents, such as bylaws, operating rules of the association, articles of incorporation, or articles of association, which govern the operation of the common interest

74

development or association." (§ 1351, subd. (j).) A "declaration" is a legal description of the common interest development, and a statement that the common interest development is a planned development or residential association. (§ 1353.) It is section 1354 that permits enforcement of these documents. (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 87-88.)

The Hudacks have not explained how these documents are enforceable as contracts. Perhaps a better cause of action would have been breach of an equitable servitude, promissory estoppel, or enforcement of the governing documents. It is unclear how the Association's policies and procedures could be transformed into a contract based upon the allegations in the second amended complaint.

Nevertheless, if the policies and procedures could be construed as a contract, the demurrer was still properly sustained. The policies and procedures section provides that "a cease and desist injunction will be sought immediately" if "any grading [is done] without prior Architectural Committee approval." Siggard had approval from the Architectural Committee. The Hudacks' second amended complaint reflects, "Hudack immediately placed a telephone call to Linda Bertorello, Chairperson of the [Association's] Architectural Committee, and asked whether or not Siggard had permits for his grading and clearing work. Mrs. Bertorello told Hudack that Siggard's grading had been approved by the [Association's] Architectural Committee, and that Siggard had the necessary County permits."

Given the allegations in the second amended complaint, there was no breach of contract, because the Association would have only been required to immediately seek

75

an injunction if Siggard lacked approval from the Architectural Committee. As the

Hudacks concede in the complaint, Siggard had the necessary approval. As a result,

there could not have been a breach on the part of the Association.

B.    BREACH OF FIDUCIARY DUTY

1.    *PROCEDURAL HISTORY*

The Hudacks' fourth amended complaint alleged the Association breached its

fiduciary duty by (a) authorizing Siggard's grading, (b) not enforcing the CC&Rs,

(c) spending Association funds on horse trails, (d) entering into easement agreements,

(e) levying and collecting unreasonable assessments, (f) failing to take legal action

against seven other property owners in La Cresta, (g) spending Association funds on an

entrance gate; (h) preparing and distributing financial statements that were false and

misleading; and (i) claiming that the Architectural Committee's meeting minutes were

private documents.

Judge Schwartz granted the Association's motion for summary adjudication as to

all four claims. At the hearing, the trial court noted more than one dispute was "often

argued within a single cause of action." The court commented that "summary

adjudication did not necessarily apply to all [of the] issues within each cause of action,

which complicated it to some degree. But the Court does have discretion to grant

summary adjudication for the entire claim, or a portion of the claim, if it think[s] it's

appropriate."

In regard to the fiduciary duty cause of action, and specifically the failure to sue

Siggard, the trial court stated that the Hudacks had the burden to show the Association's

Board "acted in bad faith, and not in a matter consistent with the interest of the Association as whole." The trial court concluded the Hudacks needed to show the Association had an ongoing duty to monitor Siggard's activities, in order for the breach to have occurred as the Hudacks alleged. The trial court concluded the Hudacks failed to show bad faith on the part of the Association. The trial court commented, "The Homeowners Association had discretion as to how it was going to enforce the CC&Rs. And its decision to attempt a cease and desist letter first is not evidence of any sort of bad faith . . . ."

In regard to the horse trail portion of the cause of action, the trial court stated that it is undisputed that the CC&Rs and bylaws do not expressly authorize the Association to establish horse trails, but there is also nothing prohibiting such activity. The trial court concluded the maintenance of horse trails was "consistent with the general purposes of the Homeowners Association," and again emphasized that there was nothing prohibiting such activity.

## 2. *ANALYSIS*

The Hudacks contend the trial court erred by granting the Association's motion for summary adjudication on their breach of fiduciary duty cause of action. Specifically, the Hudacks contend the trial court erred by interpreting the CC&Rs and governing documents, because only a trier of fact should interpret the documents, since there are conflicting interpretations. In the Hudacks' appellants' opening brief, they write, "At the very least, a jury should have been allowed to decide whether the requirement of seeking a cease and desist 'injunction' could be satisfied by merely

writing a letter, contrary to the plain meaning of the policy." Since the Hudacks focus on the injunction portion of the cause of action, we will focus on that portion as well.

"A trial court's order granting a motion for summary adjudication is reviewed de novo. [Citation.]" (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1471.) Summary adjudication must be denied if there is a triable issue of material fact. (*Everett v. Superior Court* (2002) 104 Cal.App.4th 388, 392.)

Summary adjudication was properly granted as to the Siggard "injunction issue" because in the fifth amended complaint, the Hudacks again alleged the Association approved Siggard's grading activity. The Hudacks modified the allegation to reflect that the Association abused its discretion in approving Siggard's application, but nonetheless alleged the planned grading was approved. As set forth *ante*, the policies and procedures could be interpreted as requiring the Association to seek an injunction when "grading [is done] without prior Architectural Committee approval." Siggard had the Committee's approval as alleged in the fifth amended complaint. As a result, there was not a material issue of fact and summary adjudication was properly granted, because the Association was not obliged to seek an injunction even under the Hudacks' interpretation of the policy.

To the extent the Hudacks are focusing their arguments solely on the moments after the Hudacks told the Association Siggard did not have the appropriate permits for his grading work, we find that argument to be unpersuasive as well. In the Hudacks' fifth amended complaint they alleged the following: "[A] member of the . . . Board . . . informed Hudack that the [Association's] legal counsel, Karen Kannen, had advised the

[Board] that once the Architectural Committee has granted approval for a project, such approval may not be withdrawn." Thus, it appears from the pleading that the Architectural Committee never rescinded its approval of Siggard's project. As a result, the condition upon which the Hudacks rely never came to pass, i.e., Siggard's 2006 grading was done with prior Architectural Committee approval.

## C.      EVIDENTIARY RULING

### 1.      *PROCEDURAL HISTORY*

At the hearing on the Association's motion for summary adjudication, Judge Schwartz said the court's tentative ruling was to "grant the motion for summary adjudication as to the tenth cause of action for declaratory relief; as to the seventh cause of action for breach of fiduciary duty; as to the eleventh cause of action for injunctive relief; and as to the twelfth cause of action for cancellation of written instruments in connection with the following two disputes: One, whether the Association breached a fiduciary duty, or otherwise breached the CC&Rs, in connection with [] Siggard's grading activities, and whether the Homeowners Association breached a fiduciary duty, and/or violated the governing documents when failing to file an immediate civil action for injunctive relief upon learning that [] Siggard had not obtained the permits for grading as required by [the] approval; two, whether the Association had authority, under the CC&Rs, to establish and maintain interior horse trails in entering into agreements with landowners for easements for the purpose of horse trails without amending the CC&Rs to authorize the horse trails in the first place."

At the end of the hearing, the trial court said, "So the Court's indicated will be the order of the Court, and summary adjudication [is] granted on the terms that the Court has indicated previously." The minute order from the hearing reflects, "Summary adjudication is granted as [to the Association.] Summary adjudication is as to the 7th, 10th, 11th and 12th cause[s] of action."

In a proposed written order, the Association wrote that it prevailed on the entire breach of fiduciary duty cause of action. The Hudacks objected to the proposed order. The Hudacks asserted only two portions of the cause action were summarily adjudicated—the portion concerning not seeking an injunction against Siggard, and the portion concerning maintaining horse trails. The Hudacks argued that the other portions of the fiduciary duty cause of action remained viable. The trial court rejected both parties' proposed orders and "indicate[d] the order is exactly what is stated within the transcript regarding this order."

Judge Holmes presided over the motions in limine. The Association moved in limine to "exclude evidence on previously summarily adjudicated issues." Judge Holmes summarized Judge Schwartz's reasoning concerning bad faith and how nothing prohibited the Association from maintaining the horse trails. Judge Holmes interpreted Judge Schwartz's order as concluding "no fiduciary duty was owed [to] association member[s] by the board." Judge Holmes concluded summary adjudication was granted as to the breach of fiduciary duty "cause of action." Judge Holmes granted the Association's motion in limine, saying, "So, I'll grant the motion. And I've made—I've

80

shortened this on a Post-It to say horse trails and gate actions and not suing Defendant

Siggard are already adjudicated."

### 2. *ANALYSIS*

The Hudacks contend Judge Holmes erred by misinterpreting Judge Schwartz's

ruling. The Hudacks assert Judge Holmes incorrectly concluded Judge Schwartz

granted summary adjudication as to the entire breach of fiduciary duty cause of action,

when the ruling only pertained to suing Siggard and horse trails. The Hudacks note

"there were at least 15 other issues raised by the breach of fiduciary duty cause of

action."

The Hudacks' argument is not persuasive because Judge Holmes stated expressly

on the record that Judge Schwartz's summary adjudication ruling was limited to "horse

trails[, the] gate actions[,] and not suing Defendant Siggard." The "gate actions" likely

should not have been included, but Judge Holmes did not conclude, as the Hudacks

assert, that the *entire* fiduciary duty cause of action was summarily adjudicated when

ruling on the motion in limine. Thus, the Hudacks' contention is unpersuasive.

### D. <u>JURY INSTRUCTION</u>

### 1. *PROCEDURAL HISTORY*

In the Hudacks' fifth amended complaint, they alleged the Association breached

its fiduciary duty by "fail[ing] to publish or distribute the necessary material by which

the membership may be informed of their review and of approval standards and

processes." In other words, the Hudacks asserted the Association was not following its

rules as published in the CC&Rs and governing documents, so the Association had an obligation to provide documents reflecting the rules it was following.

The trial court instructed the jury as follows: "The owner of an interest in real property in a common interest development shall provide to the prospective purchaser certain documents, including a copy of the governing documents of the common interest development. This is an obligation of the seller, and there's no obligation on the part of the Association of the common interest development to provide any documents to a prospective purchaser."

    2.  *ANALYSIS*

The Hudacks contend the trial court erred by instructing the jury that the Association "had no obligation 'to provide any documents to a prospective purchaser,'" because (1) that "is not an accurate statement of the applicable law"; (2) the Hudacks sued as owners, not prospective buyers; and (3) the instruction "misled the jury into believing that [the Association] owned no duties to the Hudacks to deliver any documents," which the Hudacks assert led to the court effectively directing a verdict in favor of the Association.

We review the propriety of a jury instruction under the de novo standard. (*Miller v. Weitzen* (2005) 133 Cal.App.4th 732, 736, fn. 3.) We begin with the contention that the instruction is not an accurate statement of the law. Former section 1368, subdivision (a), provided: "The owner of a separate interest . . . shall, as soon as practicable before transfer of title to the separate interest or execution of a real property sales contract therefor, as defined in section 2985, provide the following to the prospective

82

purchaser:" a copy of the governing documents, and various other documents, such as meeting minutes, if requested by the purchaser. (§ 1368, subd. (a) [eff. Jan. 2005].)

The jury instruction accurately reflected the law of former section 1368, subdivision (a), in that the statute required a property owner to give a prospective purchaser certain documents pertaining to the relevant homeowners' association, and the instruction informed the jury of this exact rule.

The instruction also informed the jury that an Association has no obligation to provide any documents to a prospective purchaser. This is also an accurate reflection of the law. Former section 1368, subdivision (b) provided, "Upon written request, an association shall, within 10 days of the mailing or delivery of the request, provide the owner of a separate interest with a copy of the requested items," such as the governing documents. The law reflects an association could be obligated to send the documents to a property owner, but it does not mention a prospective purchaser, thus, the jury instruction correctly reflected the law.

The Hudacks assert the jury instruction did not accurately reflect the law because it ignored the Association's continuing duty to update the Hudacks about proposed rule changes. (§ 1357.130.) The Hudacks' argument is not persuasive because the jury instruction does accurately reflect the law of section 1368. The fact that a different statute that is not mentioned within the instruction does not make the instruction inaccurate. The Hudacks may feel the overall package of instructions was incomplete due to a failure to include an instruction on the law of section 1357.130, but that does not mean the instruction concerning section 1368 presented the law incorrectly.

83

Next, we turn to the Hudacks' contention that the trial court erred by instructing the jury with the law of section 1368 because the Hudacks sued as property owners, not prospective buyers. We agree. The Hudacks' fifth amended complaint laments the lack of "annual notice[s]" updating members of the Association on the Association's practices and procedures. Assuming the trial court erred by giving an irrelevant jury instruction, we turn to the issue of prejudice. The Hudacks provide no argument concerning the issue of prejudice. As a result, we conclude the issue has been forfeited. (See *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1038 ["""""Prejudice is not presumed and the burden is on the appellant to show its existence"""""].)

Lastly, we address the Hudacks' argument that the trial court erred by instructing the jury on the law of section 1368 because the instruction "misled the jury into believing that [the Association] owned no duties to the Hudacks to deliver any documents," which the Hudacks assert led to the court effectively directing a verdict in favor of the Association. As the Hudacks point out, they sued as property owners, not prospective buyers. As a result, it is unlikely that the instruction misled the jury about the Hudacks' case, because it was fairly clear the instruction did not apply to the Hudacks' situation. In other words, rather than being misleading, the instruction was

mostly irrelevant.[9]  Accordingly, we are not persuaded that the instruction misled the jury.

Nevertheless, assuming the instruction could be found to be misleading, we will address the Hudacks' concern that the trial court effectively directed a verdict for the Association on this point.  We disagree with the Hudacks' argument because the breach of fiduciary duty cause of action was not included on the verdict form.  As a result, the jury's verdict could not have been directed, because there was no verdict.

## DISPOSITION

The judgments are affirmed.  Respondents (1) Wayne Siggard, (2) Monteleone Contractors, Inc., (3) the County of Riverside, and (4) the La Cresta Property Owners Association, are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                          J.

We concur:

RICHLI _____
                   Acting P. J.

CODRINGTON _____
                                J.

---

[9]  We theorize that a relevance argument could be made to the extent section 1368 may have applied when the Hudacks purchased Siggard's former property.